THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAMÓN ANTONIO FOURNIER SAMPEDRO, Defendant and Appellant.

No. 16079. Resubmitted February 14, 1958.—Decided June 14, 1958.

Juan B. Soto for appellant. J. B. Fernández Badillo, Attorney General (José Trías Monge, Ex-Attorney General, on the brief), Arturo Estrella, Assistant Attorney General, and Ramón C. Ruiz Sánchez, Assistant Fiscal of the Supreme Court, for appellee.

MR. JUSTICE SALDAÑA delivered the opinion of the Court.

Ramón Antonio Fournier Sampedro was charged with first-degree murder. The charge was that he "unlawfully, wilfully, and criminally, with malice aforethought, deliberation and a firm and decided intent and purpose to kill, show-

ing a perverted and malignant heart, unlawfully killed his ex-wife, Iris Nereida Hernández Matos, a human being, by strangulation; having clandestinely buried the body of the aforesaid Iris Nereida Hernández Matos in the Fournier Cemetery at Isla Verde." See §§ 199, 200, and 201 of the Penal Code of Puerto Rico (1937 ed.) 33 L.P.R.A. §§ 631, 632, and 633. In *People* v. *Fournier*, 77 P.R.R. 208 (1954), we reversed a sentence of life imprisonment imposed on the defendant after a trial in which the jury found him guilty of the crime charged. We ordered a new trial upon determining (1) that defendant's first written confession admitted in evidence had been obtained by psychological coercion, and (2) that the jury was not properly charged with respect to the rules it should follow to decide the voluntariness of a second oral confession which was also admitted in evidence and considered by the jury.

The second trial was held early in 1955. Once more the jury found the defendant guilty of first-degree murder. A motion for a new trial was filed pursuant to § 303 of the Code of Criminal Procedure (1935 ed.), 34 L.P.R.A. § 883. The Superior Court denied the motion and rendered judgment sentencing Fournier to life imprisonment.[1] The defendant appealed from the judgment rendered as well as from the order denying a new trial and assigns 14 errors. The case was heard in this Court on November 13, 1956, and thereafter submitted to the consideration of this Court. We have carefully considered all the assignments of error and we believe that not one of them is meritorious.

Iris Nereida Hernández Matos and the defendant were married early in 1947. In August 1948 a daughter was born

---

[1] Section 202 of the Penal Code (33 L.P.R.A. § 634) provides that any person guilty of first-degree murder shall be punished by life imprisonment in the penitentiary. In 1917 death penalty was temporarily abolished in Puerto Rico. See Act No. 36 of November 30, 1917 (Sp. Sess. Laws, p. 324). Act No. 42 of April 26, 1929 (Sess. Laws, p. 232), abolished permanently death penalty in Puerto Rico. See 33 L.P.R.A. § 634 and 34 L.P.R.A. § 993.

by that marriage but at the end of 1949 Iris Nereida obtained a divorce from the defendant on the ground of cruelty. The custody of their daughter was awarded to Iris Nereida and Fournier was required to pay her $150 monthly for support of the child. On September 7, 1950, Iris Nereida left her parents' home, where she lived with her daughter, to go to work. At that time she was the secretary of a doctor in Santurce. Before her marriage Iris Nereida had studied nursing in the Díaz García Hospital. She wore a dress with a full skirt, white high-heeled shoes, a silvercloth belt, and a multicolored handkerchief over her head. She carried a white handbag, a gold bracelet on her arm and a ring and a box of Kleenex, because she had a cold. As underclothes she also wore: half-slips, panties, and a brassiere. She disappeared on the afternoon of that same day. Her body was found on October 8, 1950 buried in the sand underneath the cement floor of tomb No. 4 of the Fournier Cemetery, of which the defendant was manager and co-owner. The body was lying on its face with the legs and arms bent over her back. It was fully clothed with a dress, half-slips, brassiere and a pair of panties, but one shoe was missing. On her left arm she had a gold bracelet and wore a diamond ring on her finger. The skirt of the dress was pulled over her head and between the dress and her face her handbag and a box of Kleenex were found. A multicolored handkerchief was tied over the nose and mouth. A woman's silver belt was wound around the neck of the body, in the form of a tourniquet.[2] The belt had been wound twice around the neck and knotted slightly to the right side, and inside the knot there was a 4-½ inch nail. The nail was somewhat bent inside the knot of the belt. Death had occurred approxi-

---

[2] The defense admitted that the dress, the multicolored handkerchief, the panties, the brassiere, the half-slips, the belt, the handbag, the bracelet, and the box of Kleenex (Exhibits 19, 20, 21, 22, 23, 24, 25, 26, and 27 of The People) which were found on the body, were the same garments which Iris Nereida was wearing when she left her home on the morning of September 7, 1950.

mately four or six weeks previously. The belt was tied immediately underneath the larynx and there was a deep depression on her neck. The larynx showed two fractures and the walls of the trachea were compressed by the pressure of the belt.

According to the testimony of Dr. Babbs, the pathologist who performed the autopsy, the injuries to the larynx and the trachea had been caused by the pressure of either the belt, a hand, or a blow. The cause of death was asphyxia by strangulation by means of a garrot. This witness testified that because of the manner that the belt was wound twice around her neck with a nail inside the knot, Iris Nereida could not have done it herself. The diameter of both windings was less than the diameter of her neck and even without exerting any pressure with the nail she would have been unconscious before placing it there. Dr. Taveras, the pathologist who testified as expert for the defense was of the opinion that Iris Nereida died as the result of asphyxia by strangulation, that the fractures of the larynx might have occurred after the death (in carelessly handling the body), there being a possibility that Iris Nereida committed suicide by using her own belt and the nail in the form of a tourniquet. This witness further stated that the winding of the belt twice around the neck was "a suspicious indication of suicide", specially in view of the fact that the body of the victim showed no contusions, wounds, bruises, or any other sign of violence.

The undisputed circumstantial evidence proved that on September 7, 1950, approximately at 11 p.m., the defendant buried the body of Iris Nereida at the bottom of tomb No. 4 of the Fournier Cemetery. At that time there was a line of 15 tombs having no floor. The defendant arrived on September 7, 1950 at 9 a.m. at the cemetery where he received a telephone call at about 11 a.m. He told the caretaker, Juan Ponce López, that the call had come from Lucy, Iris Nereida's sister, "who called to tell me that Iris had gone

away with her sweetheart." The defendant immediately left the cemetery in his Cadillac. He returned at about 3:30 in the afternoon in the same car; called one of his employees (Gregorio Fargas) and ordered him to dig a hole in tomb No. 4 "to see if it would leak." The employee dug a hole in tomb No. 4 about 2-½ feet deep, the full length and width of the tomb. The sand that he dug out of the hole was left there in a corner. Later the defendant left. That same night Fournier returned to the cemetery at 11 p.m. in his Cadillac, spoke to Juan Ponce López (the caretaker), and asked him for the keys to the cemetery "because I have a date with a nurse and I want to get into the cemetery." The caretaker gave Fournier the keys. At about midnight the defendant came back to return the keys to the caretaker who slept in a small house near the cemetery, and told him "Ponce, if you get up before I do . . . look for a woman's shoe that she lost in the cemetery." The defendant was sweating a little. Next day, September 8, 1950, Fournier went into the cemetery at about 6:40 a.m. with the caretaker Juan Ponce López. The hole in tomb No. 4 which had been made the preceding day was filled with sand. The defendant ordered his employees to mix some cement to pave the floors of several tombs, which included No. 4. When the employees were going to pave the floor of tomb No. 4 they found that the bottom was levelled off, ready for the cement. By order of Fournier the employees first paved the floor of tomb No. 4. About 8 a.m. the defendant left the cemetery. He returned about one and a half hour later, got out of his automobile, made a hole with a shovel between tombs No. 5 and No. 6 and there buried a package which he had taken out of his Cadillac automobile. The package was made into a bundle with both ends twisted. On October 8 when the district attorney and the police found the body of Iris Nereida in the bottom of tomb No. 4, they also found, when digging between tombs No. 5 and No. 6, that same package wrapped in a cement bag, which contained a woman's

white strapped shoe. This was the shoe that was missing from the corpse of Iris Nereida when it was discovered in tomb No. 4.[3]

About a week after the disappearance of Iris Nereida, her sisters Lucy and Aida went to see the defendant. He was in the cemetery working in a tomb. They asked him if he knew that Iris had disappeared. The defendant answered in the affirmative. One of the sisters told him they feared that she had been killed and that the person who killed her must have the means of disposing of the body. The defendant then became nervous, pale, and trembled. He answered that such a thing was impossible because before a body could be buried it was necessary to fill out many papers and that there was no means of burying a body without permission and hiding it from justice. He added that he had seen Iris Nereida several days after she disappeared, in San Juan, near the waterfront, and that he was very much interested in helping to find her. He proposed a plan: that when he would send her a check for $150 for the support of his daughter, for the month of October, Iris Nereida would perhaps come out of her hidding place and she would either come to get it herself or send someone to get the check and in that way they would find out where she was and with whom. Fournier also took one of Iris Nereida's sisters to see a big house and a smaller house which he had near the cemetery so as to prove to her that Iris Nereida was not there; he also took her around the cemetery for the same purpose.

---

[3] Dr. Babbs testified that when he saw the body it had no shoes. But that he arrived after the police and the workmen had discovered the body. An eyewitness testified that when digging in tomb No. 4 the first thing that appeared was a shoe on the foot of the deceased. The body was, as we have already said, face downward with the legs bent upward. Both shoes were introduced in evidence and marked Exhibits 30 and 31 of The People. On the other hand, we must point out that the uncontroverted testimony of four employees of the cemetery established that on September 8 Fournier dug a hole between tombs No. 5 and No. 6 and buried in it a package which was unburied on October 8. (Agapito Rosa, Pedro Andino Villalongo, Ernesto Santana Alicea, and Gregorio Fargas Ayala.)

In the morning of October 7, 1950 the defendant was "detained for investigation" and brought to the offices of the district attorney. He remained illegally detained from that moment until October 10, 1950. He was not questioned until the third day of his detention, but was held incommunicado without seeing any relative, friend, or attorney.[4] During the daytime he was detained in the office of the district attorney and at nighttime he was taken to the police station where he slept. He was never submitted to any kind of personal indignity or physical violence. At no time were any promises, threats or offers made to him to induce him to confess or testify. He was always permitted to rest, sleep, and take food normally. In the office of the district attorney he had books and newspapers at his disposal, a fan to keep cool and an armchair to rest and take a nap. He felt tranquil and actually spent most of his time reading detective stories. The bed where he slept in the police station, during the nights of October 7–8 and 8–9, had a mattress, sheets and pillows. According to the uncontroverted testimony of district attorney Viera Martínez: (1) the defendant never asked to see a relative or an attorney, and (2) no relative or attorney of the defendant asked to see him. Mr. Ramírez Brau, a newspaperman, testified on cross-examination that he saw the defendant in the office of the district attorney on October 7 during daytime; that he could not speak to him but saw him in a tranquil attitude, reading a book, with a detective in the room with him. This same witness testified, again on cross-examination, that he had entered the San Juan police station at San Francisco Street without permission from the police at 2:30 a.m. during the night of October 7–8. There he spoke to the defendant who was lying down on a bed. He asked the defendant for

---

[4] However, as we indicate hereafter, Mr. Ramírez Brau (a newspaperman) spoke to the defendant on the night of October 7–8, and in the night of October 9–10 a second cousin of the defendant (named Henry Hernández) saw and spoke to Fournier.

a picture of Iris Nereida and the defendant told him to go to the Central High School and look for the year book which contained a beautiful graduation picture of Iris. Ramírez Brau told the defendant that the district attorney was going to open some graves in the cemetery because he believed that the deceased was buried there. The defendant became angry and answered him: "Tell the district attorney to remember that I have 1,700 graves there and that he will have to pay $10 for each grave which is dug up," and that he was going to slap the district attorney. This witness also testified that the bed on which Fournier was sleeping had a mattress, clean sheets and pillows. When the body of Iris Nereida was discovered on October 8 in the Fournier Cemetery, the district attorney ordered that the defendant be brought to the cemetery. There were newspapermen, photographers and detectives present. The district attorney asked defendant three or four questions and to identify the body. According to the evidence introduced at the first trial, the defendant looked at the grave, was nervous and upset and each time that he was asked to identify the body he trembled. However, the evidence presented in the second trial as to this incident was as follows: (1) District attorney Viera Martínez testified on cross-examination the following: "Q. What was the purpose of confronting the defendant with the body of the deceased? A. Because I wanted the defendant to explain to me why was there a woman's body buried in a grave, lying on its face, without a coffin, and since he was part owner of the cemetery he could also tell me why that body was clandestinely buried there, as it seemed from appearances. Q. And how did the defendant behave when you took him to the cemetery and showed him the body? Was he nervous or not? A. He was not nervous. With absolute serenity he looked towards the grave and I asked him what was that and although it was not easy to identify the body from the back, he said that it was the body of a woman. I asked him: 'Of what woman?' and he said: 'Of

a woman.' I told him: 'Of a woman who was clandestinely buried?' and to that he gave no answer. Q. And you continued asking him questions? What other questions did you make? A. Only those that I have told you"; and (2) Mr. Ramírez Brau, upon being examined by defendant's counsel and after stating that he saw the defendant in Fournier Cemetery in the afternoon of October 8, testified as follows: "Q. Witness, and when you saw the defendant in the cemetery, what was his attitude? What did you see him do in front of the body of Iris Nereida? A. When he was confronted with the body the district attorney asked him what was that and then the defendant answered: 'The body of a woman,' period. Q. And how did he look? Calm, disturbed, trembling, or how? A. There was no violence and he was normal. I could appreciate that he showed no anormality. Q. Nor trembling or anything? A. I did not see him tremble."

After the incident in the cemetery on October 8 the defendant was brought immediately to the office of the district attorney. He remained illegally detained under the conditions we have described above. The district attorney worked continuously from that day until the night of October 9 "accumulating facts and data." On Monday October 9 at 10 o'clock at night, the district attorney began to question the defendant. The examination continued uninterruptedly for six hours. Questions and answers were taken stenographically. At the end of this lengthy examination the defendant had not yet confessed. However, after a short interval, he began to make a written detailed confession which he finished at daybreak at about six o'clock. Approximately six hours later, in the presence of several newspapermen and press photographers, the defendant made another oral confession in a house situated in the ward of San Antón, where he had strangled his ex-wife, according to his prior confession. There he confessed that he had laid Iris Nereida on a door plank which he had placed across the

bathtub; that he had wound her belt around her neck; that he had picked a nail from the floor and placed it inside the knot of the belt; that he had strangled her by using the belt and the nail in the form of a tourniquet; that he took the body out through a window and put it inside the trunk of his automobile; that one of the shoes of the victim fell to the floor as he passed the body through the window; that he threw out a button which had fallen off the dress of Iris Nereida; that he had thrown into the drainpipe some fibers of the belt which had stuck to his hands when he strangled Iris Nereida. In discussing the 13th error we shall later analyze more carefully all the circumstances surrounding both confessions of the defendant. We stop to indicate here that the first written confession was obtained by psychological coercion, as we held in *People* v. *Fournier*, 77 P.R.R. 208 (1954). However, in the first appeal taken we held, in view of the attendant circumstances, that the oral confession at San Antón was not involuntary as a matter of law, for which reason the Superior Court acted correctly in submitting to the jury the issue of voluntariness of said oral confession.[5] At the second trial the first written confession of the defendant was excluded as such. The second oral confession at San Antón was introduced in evidence as well as

---

[5] In our decision in *People* v. *Fournier*, *supra*, 265–273, it was necessary to point out that the instructions to the jury on the question of voluntariness of a confession were not correct. As we shall later indicate, in the second trial correct instructions were given to the jury and the appellant does not assign in this appeal any error on that point. The theory of the attorneys for the defendant in the first trial was that the defendant had killed Iris Nereida but that he was at the most guilty of voluntary manslaughter because he had acted in the heat of passion. See *People* v. *Fournier*, *supra*, 262. At the second trial the only evidence introduced by the defense (besides the testimony of district attorney Viera Martínez and Dr. Troyano de los Ríos, which bears on the voluntariness of the oral confession at San Antón) was the testimony of Dr. Taveras, with which the defendant tried to prove that Iris Nereida committed suicide. The trial judge correctly instructed the jury during the second trial, not only as to a possible verdict of not guilty but also as to the verdicts of first-degree murder, second-degree murder and voluntary manslaughter.

the proof on its voluntariness so that (1) if the jury determined that it was voluntarily made to give it such weight as they felt it deserved, the same as any other evidence duly admitted, or (2) if the jury decided that it was involuntary, it should reject and disregard it. Since the jury again found Fournier guilty of first-degree murder, he again raises the question of whether, as a matter of law, the second oral confession at San Antón was obtained by psychological coercion. And furthermore, the defendant alleges that the court committed 13 other errors.

We shall now discuss the errors assigned by appellant in the same order in which he presents them in his brief. We shall refer to other facts and to other evidence as there might be need in the course of the discussion of these assignments.

I

The first error assigned is that the lower court "committed error in permitting the district attorney to state his theory of the case in a manner that might inflame the mind of the jury with passion and prejudice, as well as give the impression that the defendant was guilty of the crime charged". As it is known, in Puerto Rico the district attorney opens the trial by stating orally to the jury the nature of the crime which he intends to prove, the circumstances under which the crime was committed, and the proofs which he expects to produce to support his charge. Section 233 (3) of the Code of Criminal Procedure, 1935 ed., 34 L.P.R.A. § 712 (3). Appellant complains that the district attorney (1) made statements which constituted arguments; (2) offered to prove that the defendant had to pay an allowance to Iris Nereida, but at the trial it appeared that it was his daughter to whom the defendant had to pay the allowance and not to his ex-wife; (3) he offered to prove that Iris Nereida, because of the life that the defendant gave her, sued the latter for divorce on the ground of cruelty, that the defendant was summoned on August 10, 1949 and

the divorce was decreed on September 9, 1949. According to the appellant the conduct of the district attorney deprived the defendant of a fair and impartial trial and of the due process of law because he aroused in the mind of the jury passion and prejudice against the defendant.

We do not agree. In the first place, the district attorney did not make "arguments" in his opening statement of the case nor did he make any remark that could arouse the passion of the jury to the detriment of the defendant. He merely outlined in detail the facts which he intended to prove and which were connected with the case. He was perfectly entitled to do so in order to inform the jury properly of all issues which they had to settle when the case was submitted to them. There is no rule limiting the opening statement to the ultimate facts of the crime, as appellant alleges. The district attorney may state in detail in his opening address "the circumstances under which the crime was committed" and even more, "the proofs which he expects to produce for upholding his charge". It is so provided in § 233(3) of the Code of Criminal Procedure. Cf. People v. Beltrán, 73 P.R.R. 466, 471–2 (1952); People v. Carreras, 62 P.R.R. 148, 150 (1943); People v. Pierantoni, 60 P.R.R. 13, 15–6 (1942) and People v. Juarbe, 37 P.R.R. 433, 434–5 (1927).

In the second place, the statement made by the district attorney in his opening argument or address as to the allowance for support was as follows: ". . . the defendant was required to pay an allowance for support to Iris Nereida Hernández Matos and daughter." This statement was not objected to by the defense. (Tr. Ev., 2d piece, pp. 9–10). This in itself constitutes a waiver, except in exceptional cases. See 28 A.L.R. 2d 972, 984–85. Here the evidence presented at the trial showed that the defendant was only required to pay an allowance for the support of the girl to the mother, that is to Iris Nereida. Appellant contends that the statement of the district attorney in his opening argument was that "the defendant was required to pay an

allowance to the deceased, leaving an inference, to the prejudice of the defendant, that the latter killed her to free himself of that obligation." It is obvious that the district attorney did not make such a statement either directly or indirectly. We need only revert to the exact words pronounced by the district attorney. Furthermore, in Puerto Rico the fact that the district attorney in stating his theory refers to facts which he fails to prove subsequently, does not constitute reversible error if the district attorney acted in good faith and no substantial prejudice resulted against the defendant. See *People* v. *Díaz*, 74 P.R.R. 348, 355-6 (1953). This is the rule generally recognized by a majority of the American states. See 28 A.L.R. 2d 972, 974-82; and Abbott's *Criminal Trial Practice*, 464-66, 4th ed., 1939. In the case at bar the evidence showed with respect to the allowance for support that it was partly different from what the district attorney had stated. But a study of the record and of the discrepancy sufficiently indicates that the district attorney acted in good faith and that his statements did not influence the jury to the prejudice of the defendant. It is an excusable and insignificant error. *Cf. People* v. *Díaz, supra; State* v. *McDonald*, 152 Pac. 1139 (N.M. 1915); *People* v. *Alexander*, 106 P.2d 450, 454 (Cal. 1940).

Finally, as to the statements made by the district attorney in his opening argument with respect to the grounds which Iris Nereida had to obtain the divorce from the defendant, with respect to the summons and the divorce decree rendered, it is well to indicate that they were never objected by the defense. (Tr. Ev., 2d piece, p. 10.) Furthermore, at the trial the district attorney offered evidence tending to prove what he said: the entire judgment roll in the divorce suit between Iris Nereida and the defendant. But the judge only admitted in evidence the divorce decree and notice thereof. The decree shows that the marriage was dissolved on the ground of cruelty. There is no indication that the district attorney acted in bad faith or that his statements

caused substantial prejudice to the defendant. Therefore, the statements of the district attorney in his opening argument did not constitute misconduct and do not call for reversal. See *People* v. *Díaz, supra,* 355–6; *State* v. *Myers,* 79 N.W. 2d 382, 387 (Iowa 1956); Fricks, *California Criminal Procedure* 393 (5th ed. 1955); 28 A.L.R. 2d 972, 974–84. *Cf. People* v. *Ruiz,* 79 P.R.R. 902, 903, and *People* v. *Gordon,* 163 P. 2d 110, 126 (Cal. 1945).

## II

 The next six assignments of error refer to the alleged misconduct of the district attorney and of the judge in the course of the closing argument to the jury. Appellant maintains that it is reversible error for the district attorney to state: (1) that since the defendant adapted himself to the penitentiary as if he were at home, according to the testimony of the psychiatrist, that was the appropriate place for the jury to send the defendant; (2) that the defendant not only committed first-degree murder but also committed another crime in burying clandestinely the body of Iris Nereida; (3) that in tying a knot around the neck of the victim the defendant had also tied it around the neck of her relatives and the neck of the child; (4) that in the future when the girl must be told where her father is, the jury should not allow it to be said that he is walking leisurely through the streets of San Juan. He further contends that the judge erred in not ordering the stenographer to take down certain portions of the argument of the district attorney to the jury when the defense so requested.

Before analyzing one by one the incidents of which appellant complains, it seems convenient to state here the principles of law which prevail in Puerto Rico as to the contents and form of the closing arguments to the jury. The determination of questions of fact by a jury requires inferences that are to be drawn by them from the oral and documentary evidence presented. In order to direct the jury's attention

to these inferences, the district attorney as well as defendant's counsel must present them in their arguments. For that reason in their closing addresses to the jury the prosecuting attorney and defendant's counsel may comment on the evidence presented and they have ample freedom to make conclusions, inferences, deductions and arguments derived therefrom. It does not matter whether those conclusions, inferences, deductions and arguments are improbable, illogical, erroneous, or absurd. Any argument based on the evidence is normally proper and the requirement that it should have some basis on the evidence is liberally construed. But no argument is legitimate if it refers to evidence which was not admitted at the trial. Besides, there are other limits to the requirements of a legitimate argument: it should not inflame or arouse the passion or prejudice of the jury (1) by referring to inadmissible evidence; or (2) by urging them to draw inferences not warranted by the evidence admitted; or (3) by asking them to disregard admitted evidence and to base their verdict on irrelevant considerations; or (4) by asking them not to weigh the evidence as provided by law; or (5) by appealing to differences in race or economic position against the defendant; or (6) by commenting on the failure of the defendant to testify. On the other hand, the use of certain phrases or expressions in their arguments may in extreme cases constitute misconduct. Naturally, few verdicts could be sustained unless the appellate court makes allowances for the zeal and ardor which characterize a trial. As a general rule it is not considered misconduct to appeal to the jury's sympathy on the basis of the evidence presented. Flights of eloquence, rhetoric and pathos in the speeches made by the district attorney and by defendant's counsel are legitimate provided they do not exceed certain limits. The prosecution as well as counsel for the defense may use oratorical, literary or poetic figures of speech and even indulge in certain vituperations and invectives which do not necessarily constitute misconduct. But this latitude in the argument cannot de-

generate into abusive conduct. It all depends on the facts of each particular case. In this respect the presiding judge has ample discretion: he knows the atmosphere of the trial, he hears the emphasis given to each comment, he appreciates the susceptibility of the jury and the degree of attention given to one or another part of the argument. Even assuming that the district attorney made improper remarks in his address, a reversal would not lie unless it were shown that they resulted in prejudice to the substantial rights of the defendant, that is, that the verdict was influenced by such misconduct. Furthermore, an advice or instruction of a judge directing the jury not to take into consideration an improper argument of the district attorney generally cures any error, except in certain exceptional cases where nothing said by the judge can eradicate the prejudicial effects against the defendant. Likewise, in this respect everything depends on the issues involved, on the parties, and on the atmosphere of the trial. For that reason the judge sitting in a case has also ample discretion which should not be disturbed unless clear abuse is shown. Undoubtedly, within these standards considerable latitude is allowed the district attorney as well as counsel for defendant in their arguments before a jury. See *People* v. *Febres,* 78 P.R.R. 850, 857 (1956); *People* v. *Burgos,* 76 P.R.R. 187, 196 (1954); *People* v. *Archeval,* 74 P.R.R. 478, 485 (1953); *People* v. *Montes,* 64 P.R.R. 306, 310 (1944); *People* v. *Aspurúa,* 61 P.R.R. 244, 249–50 (1943); *People* v. *Marrero,* 48 P.R.R. 875, 883–84 (1935); *People* v. *Marchand,* 53 P.R.R. 640, 648–52 (1938). See also *People* v. *Rivas,* 68 P.R.R. 439, 446 (1948); *People* v. *Zayas,* 65 P.R.R. 504, 506 (1946); *People* v. *Colón,* 65 P.R.R. 714, 722–24 (1946); *People* v. *Yera,* 60 P.R.R. 796 (1942); *People* v. *Piazza,* 60 P.R.R. 561, 568 (1942); *People* v. *Cabrera,* 59 P.R.R. 133, 143–4 (1941). *Cf. State* v. *Harless,* 86 N.W. 2d 210, 213–14 (Iowa 1958); *People* v. *Heidman,* 144 N.E. 2d 580, 586 (Ill. 1957); *Bowman* v. *Commonwealth,* 290 S.W. 2d

814, 816–18 (Ky. 1956) ; *State* v. *Brown*, 213 P. 2d 305, 309 (Wash. 1949) ; *State* v. *Lane*, 182 S.E. 784, 787–88 (W. Va. 1935) ; *People* v. *Preston*, 173 N.E. 383, 389 (Ill., 1930) ; *Stanfill* v. *Commonwealth*, 272 S.W. 1, 3 (Ky. 1925) ; 88 C.J.S., *Trial*, § § 169–200.

■ 1. In the course of his closing argument to the jury the district attorney said "that the defendant adapted himself to the penitentiary" and made the argument that "since he adapts himself to the penitentiary as if we were at home, it is to the penitentiary where the jury should send the defendant." He also said that the penitentiary "is the appropriate place for the defendant." As we shall later point out, Dr. Troyano de los Ríos, a psychiatrist, stated that the defendant felt quite at home in the penitentiary, that he was optimist, always willing to cooperate and accustomed to the discipline of that institution. Therefore, the statements of the district attorney constitute an argument based on the evidence admitted in the case. The defense objected and the judge overruled the objection. Although such an argument to the jury could have been made more discreetly, we believe that it falls within the bounds of a legitimate argument and it could not have aroused in the jury the belief that it could not render a verdict of acquittal if they deemed it proper. Nor do we believe that it prejudiced defendant's substantial rights or that it was sufficient to warrant a reversal of the judgment. *Cf. People* v. *Febres*, 78 P.R.R. 850, 857 (1956) ; *People* v. *Burgos*, 76 P.R.R. 187, 196 (1954) ; *People* v. *Halteman*, 139 N.E. 2d 286, 292–93 (Ill. 1957) ; *State* v. *Brown*, 213 P. 2d 305, 309 (Wash. 1949) ; *Ladd* v. *State*, 207 P. 2d 350, 358–59 (Okla. 1949) ; *State* v. *Lane*, 182 S.E. 784, 787–88 (W.Va. 1935) and *People* v. *Preston*, 173 N.E. 383, 389 (Ill. 1930).

■ 2. In his turn of rebuttal the district attorney said that "it appears from the circumstantial evidence that the defendant not only committed first-degree murder but he also committed another crime when he buried her clan-

destinely." When defendant's counsel objected, the judge stated that "the district attorney is referring to the fact that the defendant buried her and this point was amply discussed by defendant's counsel in analyzing the incident which the district attorney has called a crime." The judge refused to order the district attorney to stop arguing on the clandestine burial of Iris Nereida by the defendant. It is well to point out that the defendant was charged in the information with having killed Iris Nereida with malice and premeditation and also with having "buried clandestinely the body of the aforesaid Iris Nereida Hernández Matos in the Fournier Cemetery of Isla Verde." Attorney for the defense raised no objection to the language in which the charge was couched. The undisputed circumstantial evidence presented at the trial shows that the defendant buried clandestinely the body of Iris Nereida under a cement floor in tomb No. 4 of Fournier Cemetery, between 11 and 12 o'clock midnight on September 7, 1950. As we said in *People* v. *Archeval*, 74 P.R.R. 478, 482 (1953) : "The general rule is to the effect that in criminal prosecutions . . . evidence of other offenses committed by the defendant is inadmissible. . . . By exception, evidence of other offenses is admissible when the former offense is a material fact to establish the commission of the crime charged, or when it is a part of the *res gestæ* or when said evidence is presented to show motive, intent, premeditation, malice or a common plan, or when both offenses form part of the same transaction." See, also, *People* v. *Román*, 70 P.R.R. 48 (1949) and *People* v. *Pérez*, 47 P.R.R. 724 (1934). Even without any allegation to that effect the People could present evidence against the defendant in connection with the concealment of the body of Iris Nereida and its clandestine burial. See *People* v. *Marín*, 38 P.R.R. 598, 603–04 (1928) ; 1 Morgan, *Basic Problems of Evidence* 188–89 (1954) ; 2 Wigmore *on Evidence*, § § 300–73 3rd. ed., (1940) ; 1 *Wharton's Criminal Evidence* § § 233–42 (12th ed., 1955). The argument of

the district attorney conformed to the evidence which had been duly admitted at the trial and it is obvious that it was not misconduct on his part to refer in his argument of rebuttal to that action of the defendant as a crime. See, *State v. Lane*, 182 S.E. 784, 787–88 (W.V. 1935); *Browder v. Commonwealth*, 22 S.W.2d 615, 617 (Ky. 1929). *Cf. People v. Archeval*, 74 P.R.R. 478, 485 (1953).

▮ 3. In his argument of rebuttal to the jury the district attorney said that "in tying the knot around the neck of the victim the defendant tied a knot around the neck of the relatives and around the neck of the child." Defendant's counsel objected and the judge advised the jury in connection with the statements of the district attorney as follows: "No one believes here that a knot has been tied around the neck of the victim's family or around the neck of the victim's child. That is merely a figure of speech used as such. Here the only evidence is that a knot was tied around the neck of Iris Nereida or that she tied it herself, and then the district attorney puts it that way . . . but it was a figure of speech and you shall not take into account the statements of the district attorney as facts proved but as a figure of speech." Defendant's counsel added "it is a metaphor" and the judge said to the jury: "he (defendant's counsel) already said that it is a metaphor." We believe that the remark of the district attorney does not exceed the bounds of eloquence or pathetic speech ordinarily permitted in cases of this nature. See *People v. Burgos*, 76 P.R.R. 187, 195–6 (1954); *People v. Preston*, 173 N.E. 383, 389 (Ill. 1930) and *Stanfill v. Commonwealth*, 272 S.W. 1, 3 (Ky. 1925). In any event, even if the remarks of the district attorney were improper, the judge sitting in the case cautioned the jury to disregard it. This instruction was given promptly and concretely. Therefore, any possible error was cured and the substantial rights of the defendant were not violated. See *People v. Rivas*, 68 P.R.R. 439, 446 (1948); *People v. Zayas*, 65 P.R.R. 504, 506 (1946); *People*

v. *Yera*, 60 P.R.R. 796 (1942) ; *People* v. *Cabrera*, 59 P.R.R. 133, 143–4 (1941). *Cf. United States* v. *Johnson*, 129 F.2d 954, 962–63 (C.A. 3, 1942).

 4. In his turn of rebuttal the district attorney said to the jury that "in the future when the girl must be told where her father is, the jury should not permit it to be said that he is walking leisurely through the streets of San Juan." Defendant's counsel objected and the presiding judge warned the jury "the district attorney has said this in a literary outburst which (defendant's counsel) did not let him finish." Appellant now alleges that the district attorney was thus allowed to appeal to the sympathy, passions, and prejudices of the jury in a manner calculated to induce the jury to render a verdict of conviction. In our opinion the prosecutor's argument constitutes a deviation from good practice. However, in view of all the circumstances of this case we do not believe it warrants a reversal of the judgment. In *Bowman* v. *Commonwealth*, 290 S.W. 2d 814, 818 (Ky. 1956), in a prosecution for murder and rape of a 72-year old lady, the district attorney said that the victim would never be able to tell what happened on that terrible afternoon in her room and added "What about all of the other old ladies and mothers and widows who are living by themselves . . . where servants come about the house? Are we to expose them to the same fate . . . ? Are we to let them suffer the same thing by saying that we don't have the guts to sentence this man to death penalty?" The Supreme Court of Kentucky held that this remark did not warrant the reversal of the judgment. In *State* v. *Baker*, 192 P. 2d 839, 842 (Wash. 1948), in a prosecution for rape, the prosecuting attorney in his address to the jury said: "But if you don't find him guilty you are going to turn him back on the street and one of you or the wife of one of you gentlemen are going to wake up some day and find the same thing happens to you." The Supreme Court of the State of Washington held that those statements did not constitute prejudicial error to

the defendant. In *State* v. *Zakoura*, 68 P. 2d 11, 16 (Kan. 1937) the district attorney said to the jury: "Gentlemen of the jury, as you go to the jury room . . . . . Let's not forget the sorrowing sisters—let's not forget the sorrowing relatives of the deceased." It was held that this did not trascend the limits of a legitimate argument and that it did not prejudice the defendant. In *Vincent* v. *State*, 165 So. 844, 847 (Ala. 1936), the prosecuting counsel in his opening argument to the jury said that the state did not ask them to make a widow out of a woman and to turn her loose to face the problems of life. The court held that reversal of the judgment did not lie. It stated that "while protracted impassioned appeals to the jury, when wife and children, probably in tears are present, have been condemned, this should not be extended to shut off comments bringing to the jury a deep sense of the consequences of the work of the manslayer." In *Stanfill* v. *Commonwealth*, 272 S.W. 1, 3 (Ky. 1925), in a prosecution for murder counsel for the Commonwealth remarked in his address to the jury that the parents of the deceased had come all the way from Virginia to witness the trial of the slayer of their son and that they should not disappoint them by announcing to them through their verdict, that the Commonwealth of Kentucky condoned murder by allowing the perpetrator to go acquitted. It was held that this remark did not warrant the reversal of the judgment. Undoubtedly, the statements made to the jury in those cases are much stronger than those now before our consideration. Furthermore, the judge here explained to the jury that the district attorney had made such remarks in a "literary outburst". For that reason, without expressing any approval of the argument made by the district attorney, after examining its context and in the light of the circumstances and nature of the case, we are convinced that a reversal is not warranted. It seems obvious that the judge who presided the trial did not abuse his discretion in permitting the district attorney to make such state-

ments which he later called "literary outburst". For the reasons previously stated, unless the trial judge abuses his discretion in determining what arguments are legitimate and what arguments unduly prejudice the defendant, we shall not reverse judgment on the basis of misconduct of the district attorney in addressing the jury. See *Commonwealth* v. *Turza*, 16 A. 2d 401, 406–07 (Pa. 1940) ; *State* v. *Harless*, 86 N.W. 2d 210, 213–14 (Iowa 1958).

 5. When the district attorney was addressing the jury in his turn of rebuttal, the defendant's counsel asked the judge to order the stenographer to take notes of the prosecution's arguments. The judge stated that "he is ordered to take down any word or phrase stated by the district attorney to which you object", but he refused to order the stenographer to take notes of the entire speech. As we said in *People* v. *Vélez*, 77 P.R.R. 775, 777–78 (1955), in criminal cases tried before the courts of Puerto Rico, the stenographer reporters never take in shorthand the closing arguments of the prosecuting attorney or of defendant's counsel. The same thing happens in a majority of the states of the American Union and in the federal courts. *Cf.* 88 C.J.S., *Trial*, § 196. The defendant may request that these arguments be taken in shorthand and in that case the court should order the stenographer to do so. In the instant case the request made by defendant's counsel was untimely. It was made when the district attorney was making his rebutting arguments after he had made his opening address and defendant's counsel had finished his address to the jury. Furthermore, as is customary, the presiding judge ordered the stenographer, at the commencement of the trial, that every time that defendant's counsel objected to the remarks of the district attorney, he should take down the remarks objected to. This was done each time. The stenographer's record contains all the statements of the district attorney objected to by defendant's counsel as prejudicial to defendant's rights. Each time that defendant's counsel requested

that the district attorney's statements be taken down because he believed them to be prejudicial, the judge ordered the stenographer to do so. Therefore, we do not believe that the defendant here was prejudiced by the conduct of the trial judge.

## III

The eighth assignment alleges that the lower court "committed error in admitting the photographs of the grave and of the body of the deceased over defendant's objection." He alleges that those photographs were not intended to prove any disputed fact and that they only sought to arouse the sympathy and prejudice of the jury against the defendant. We do not agree. The photographs were admissible in evidence: (1) to show the place where the body was found and the excavations made in Fournier Cemetery to discover the body, and (2) to show the manner in which Iris Nereida was buried in tomb No. 4, the position in which the body was found and the manner in which the belt was tied around her neck with a nail in the form of a tourniquet. They explained and corroborated the testimony of witnesses as to essential facts of the case. Therefore, they were clearly admissible in evidence. We have already held that: "The bare fact that a photograph may influence the jury against defendant does not require its exclusion provided it has been offered in evidence for a legitimate purpose of the prosecution." *People* v. *Torres*, 75 P.R.R. 219, 222 (1953). The district attorney offered the photographs here for a legitimate purpose and not for the sole purpose of creating prejudice in the mind of the jury. Under these circumstances their admission did not prejudice defendant's rights. See *People* v. *Rivera*, 69 P.R.R. 500, 502–3 (1949) and *People* v. *Zayas*, 65 P.R.R. 504, 507–8 (1946). Naturally, the photographs of a dead body are repulsive, but that fact does not mean that they contain grotesque expositions or that they are inadmissible because they impress the jury. In this

case all the photographs were taken with precision and faithfully represent the facts on which various witnesses had attempted to give an oral description. There is no doubt that they were correctly admitted in evidence. *Cf. People* v. *Márquez*, 67 P.R.R. 303, 311–12 (1947).

The tests of admissibility of photographs of the deceased's body and of the grave in question applicable to the case at bar are recognized, contrary to appellant's allegations, by the doctrine and the case law. See 3 Wigmore *on Evidence* § § 792–98, (3rd ed., 1940); 2 *Wharton's Criminal Evidence* § 686, (12th ed., 1955); 1 *Underhill's Criminal Evidence* § 117, (5th ed., 1956). There is abundant jurisprudence to this effect. See *State* v. *Triplett*, 79 N.W. 2d 391, 397–98 (Iowa 1956); *Commonwealth* v. *Noxon*, 66 N.E. 2d 814, 840 (Mass. 1946); *Commonwealth* v. *Gray*, 49 N.E. 2d 603, 604 (Mass. 1943) and *State* v. *Heinz*, 275 N.W. 10, 16 (Iowa 1937). Moreover, some courts have allowed the jury to be shown colored slides projected on a screen and so enlarged, to represent a corpse and the conditions revealed by its autopsy, even in a criminal prosecution for the murder of a 15-year old girl. See *Commonwealth* v. *Makarewicz*, 132 N.E. 2d 294, 299 (Mass. 1956).

## IV

The next four assignments of error refer to certain instructions requested by defendant's counsel and which were refused by the trial judge. Appellant asked the judge to give the following instructions to the jury: (1) "The court instructs the gentlemen of the jury that if you reach the conclusion that the confession at San Antón is involuntary, you should reject the entire testimony of Ramírez Brau, Sánchez Ortiz, Casenave, and Laureano and absolutely disregard them, that is, as if they had not testified"; (2) "The court instructs the gentlemen of the jury that if you reach the conclusion that the oral confession at San Antón is involuntary, the evidence offered by The People is circumstantial;

and there is no direct proof of how death took place. It is for you to determine if with this circumstantial evidence it has been proved beyond a reasonable doubt that the defendant committed the crime of first-degree murder"; (3) "Gentlemen of the jury, the lack of purpose or of any apparent motive for committing the crime is a strong circumstance to be considered in favor of the defendant; and in cases depending on circumstantial evidence, as would be the case which is now before you, if you reject, as involuntary, defendant's confession at San Antón, not only is the motive or purpose material to the case, but at times it is an element of vital importance"; (4) "Gentlemen of the jury, the conduct of the defendant with respect to the body of Iris Nereida Hernández Matos after her death, although pertinent for the purpose of connecting the defendant with the fact of her death, is not sufficient to establish the guilt of the defendant, nor to prove his premeditation as to said death." The lower court refused to give these four requested instructions.

We believe that the special instructions requested here were substantially covered in the general and special instructions which the judge gave to the jury *sua sponte*. Furthermore, the requested special instructions 1, 3, and 4 were drafted so as to create confusion, they tended to favor the cause of the defendant improperly and they might have induced the jury to error. The lower court may, without committing any error, refuse such special instructions. See *People* v. *Santiago*, 78 P.R.R. 627, 638–9 (1955); *People* v. *Lampón*, 78 P.R.R. 102, 108 (1955); *People* v. *Jiménez*, 78 P.R.R. 7, 15 (1955); *People* v. *Vélez*, 77 P.R.R. 775, 779–81 (1955); *People* v. *López*, 77 P.R.R. 573, 580–1, 589 (1954); *People* v. *Castro*, 72 P.R.R. 92, 103 (1951); *People* v. *Baerga*, 70 P.R.R. 85, 88 (1949); *People* v. *Rodríguez*, 66 P.R.R. 302, 312–13 (1946).[6]

---

[6] *Cf. People* v. *Moses*, 142 N.E. 2d 1, 4 (Ill. 1957); *State* v. *Tolson*, 82 N.W. 2d 105, 110 (Iowa 1957); *Commonwealth* v. *Agiasottelis*, 142 N.E. 2d 386, 388–89 (Mass. 1957); *State* v. *Eubanks*, 94 So. 2d 262,

■ The request for instruction No. 1 was unnecessary because even if it were correct, it was substantially covered by the general instructions to the jury with respect to the oral confession at San Antón. In effect, the trial judge charged the jury as follows: "Gentlemen of the jury, if after examining all the facts and circumstances under which the confessions in question were given, which as I have already told you and as a matter of law No. 42 as well as No. 43, are inadmissible and should only be considered by you in order to determine the voluntariness of the confession at San Antón, you reach the conclusion that the latter was involuntary, that is, that the district attorney has not affirmatively proved that the confession at San Antón was voluntary, you shall reject and wholly disregard them in deciding this case . . . ." (Tr. Ev., 6th piece, p. 281.) Later the judge repeated: "If as a result of the evidence and of your own analysis, you reach the conclusion that the district attorney did not affirmatively prove beyond a reasonable doubt that the psychological coercion which existed at the time the confessions were made in the office of the district attorney had ceased when the defendant made his confession at San Antón, then you should definitively reject the confession at San Antón." (Tr. Ev., 6th piece, p. 109.) On the other hand, in admitting in evidence the testimony of Ramírez Brau, Sánchez Ortiz, Casenave, and Laureano, the effect of such testimony was not limited to a single purpose. This is so although actually their testimony referred to the circumstances which mainly dealt with the voluntariness of the oral confession at San Antón. Therefore, appellant was not entitled to a special cautionary instruction limiting the evidence to one purpose as he requested with respect to the testimony of Ramírez Brau, Sánchez Ortiz, Casenave, and Laureano. *Cf. Nye & Nissen* v. *United States,* 168 F. 2d

268 (La. 1957); *State* v. *Colvin,* 307 P. 2d 98, 104 (Ariz. 1957); *People* v. *Nunn,* 296 P. 2d 813, 820 (Cal. 1956); *People* v. *Hays,* 225 P. 2d 600, 605 (Cal. 1950).

846, 857 (C.A. 9, 1948); Abbott's *Criminal Trial Practice* § 682 (1939).

 We do not see how appellant can charge error to the lower court because it refused to give the jury the second requested instruction. In fact the trial judge charged the jury in almost the same words as proposed by defendant's counsel in this second requested instruction. The judge charged the following: "If you decide that the declaration or confession at San Antón is involuntary . . . in that event there remains only a case of circumstantial or inference evidence and I shall explain to you what is circumstantial evidence. There are two classes of evidence recognized and admitted by the courts of justice, and a defendant may be found guilty on either one. One of them is the direct or positive testimony of an eyewitness with respect to the commission of the offense. This is called direct evidence. The other kind of evidence is that proof which by a series of interrelated circumstances points, within a degree of convincing power, to the commission of a crime by the defendant. This is known as circumstantial or presumptive evidence . . . . The court charges the jury that to justify a conviction on circumstantial evidence alone, it is not only necessary that the circumstances should all concur to show that he committed the crime charged, but they must all be inconsistent with any other rational conclusion. . . That is, in cases of circumstantial evidence the proven facts must not only be compatible with defendant's guilt but they must also be incompatible with any other rational hypothesis of his innocence; and each independent fact from which guilt is inferred must be proved by means of evidence as satisfactory to the mind and conscience of the jury and to the same extent as is required in a case of direct evidence." (Tr. Ev., 6th piece, pp. 110–12.) The court had already charged the jury properly that defendant's guilt must be proved beyond a reasonable doubt and it stated correctly the concept of "guilt beyond a reasonable doubt." Therefore,

the judge was actually more explicit and more favorable to the defendant on the specific point requested in instruction No. 2, than defendant's own request.

■ We believe it was unnecessary to give the jury requested instruction No. 3. In the first place the judge had already accurately defined in his instructions to the jury the standards for determining whether the defendant was guilty of first-degree murder ("premeditation", "malice", "deliberation", "willfulness", etc.), and he had also given specific and proper instructions as to what constituted (1) second-degree murder, and (2) voluntary manslaughter. On the other hand, there was sufficient circumstantial evidence from which the jury could have inferred that there was a motive or purpose for the crime and the court was therefore wholly justified in refusing to give instruction No. 3. See *Roeder* v. *State*, 227 N.W. 446, 448 (Neb. 1929). *Cf. California Jury Instructions—Criminal* 61–62 (1946). In any event the court need not charge the jury as to the lack of a motive or purpose for the crime if (1) there is clear and convincing evidence that the crime was committed; see *Evans* v. *State*, 155 N.E. 203 (Ind. 1927); or (2) the intention has been proved by circumstantial evidence. See *State* v. *Leonard*, 112 N.W. 784 (Iowa 1907).

■ The fourth requested instruction was not proper either. The judge had already charged the jury clearly and specifically on all the elements of first-degree murder, second-degree murder, and voluntary manslaughter. He had explained the concept of "premeditation" and the applicable test to determine the guilt of the defendant. The lower court need not give instructions to the jury in the exact language of the request, or so as to mislead the jury or unduly favor the defendant. See *People* v. *Marti*, 43 P.R.R. 421, 422 (1932); *People* v. *Ramírez*, 50 P.R.R. 224, 243–4 (1936); *People* v. *Nieves*, 57 P.R.R. 769, 786 (1940); *State* v. *Rogers*, 116 A. 2d 37, 48 (N. J. 1955); *People* v. *Halteman*, 139 N.E. 2d 286, 293 (Ill. 1957). On the other hand,

when the jury returned to the courtroom *motu proprio* and requested additional instructions, the court again explained in detail what constituted first-degree murder, second-degree murder, and voluntary manslaughter, stressing the meaning of the terms "willfully", "premeditation", "deliberation", and "malice". At that point one of the members of the jury, in the name of the others, asked the judge the following: ". . . in manslaughter, does the fact that the body of the victim is mishandled affect in any way the classification just made by Your Honor?" To this the judge answered: "No, sir, it is not affected." (Tr. Ev., 6th piece p. 106.) This suffices to indicate that in any event, the defendant was not prejudiced by the refusal of the judge to give the jury requested instruction No. 4.

## V

The thirteenth assignment alleges that the lower court erred ". . . *in admitting in evidence, as a matter of law, defendant's oral confession at San Antón.*" It should be noted that abiding by our judgment in *People* v. *Fournier*, *supra*, at 242–47, the Superior Court proceeded to determine first (in the absence of the jury) whether the oral confession at San Antón was voluntary or not, as a matter of law. The judge considered all the facts and circumstances preceding the first written confession (Exhibit 42 of The People), and the coercive influences of a psychological character which procured said written confession at daybreak on October 10, 1950. In that respect he took into consideration the nature, form and contents of the interrogation to which the district attorney submitted the defendant for six hours in the night of October 9–10 (Exhibit 43 of The People). He examined this interrogation and the first written confession solely in connection with the voluntariness of the second oral confession. The judge also considered the testimony of Luis de Casenave, Enrique Ramírez Brau, Jesús Laureano, Ernesto Sánchez Ortiz, and Henry

Hernández, which were introduced by the prosecution in order to establish the voluntariness of the second oral confession at San Antón. Likewise he weighed the evidence which consists (1) of a set of 12 photographs which were taken while the defendant made his oral confession at San Antón, and (2) of a set of 5 photographs of the defendant taken between 8 and 10 a.m. on October 10, 1950, before taking the trip to San Antón. Finally, the judge considered the testimony of district attorney Viera Martínez, who was called as defendant's witness with respect to the preliminary issue of voluntariness. Based on all this evidence he decided that the oral confession at San Antón was not involuntary as a matter of law; that the evidence on this point was contradictory; and that it was for the jury to determine whether or not it was voluntarily made, giving it such weight as they deemed convenient if they decided that it was voluntary or disregarding it if they were satisfied it was not voluntarily made.

The jury was then called to the courtroom and the parties again presented the evidence as to the voluntariness of the oral confession made by the defendant at San Antón. Enrique Ramírez Brau, Jesús Laureano, Ernesto Sánchez Ortiz and Luis de Casenave again testified before the jury as witnesses for The People. There was also presented and admitted in evidence: (1) the 12 photographs taken at San Antón, and (2) the 5 photographs of defendant taken between 8 and 10 a.m. on October 10, 1950, before the trip to San Antón. In addition, defendant's counsel called as his witnesses Dr. José E. Taveras, a pathologist, and Dr. Rafael Troyano de los Ríos, a psychiatrist. The jury examined Exhibits 41 and 43 of The People which contain (1) the first written confession made by the defendant before 6 a.m. on October 10, 1950, and (2) the entire interrogation to which the defendant was submitted by the district attorney for six hours on the night of October 9–10 of that year. These two exhibits correspond to Exhibit 48 and Exhibit A

of the first trial mentioned in *People* v. *Fournier*, 77 P.R.R. 208 (1954). They were admitted in evidence for a limited purpose: to show the coercive influences that induced the first confession. On the other hand, as we shall later indicate, the trial court gave specific instructions to the jury that those exhibits could not be considered in relation to defendant's guilt and that they were only material as to the issue of the voluntariness of the second oral confession. Both exhibits were admitted in evidence without defendant's objection and submitted to the jury for that purpose. (Tr. Ev., 5th piece, pp. 765–70.) In this appeal the defendant has not raised any question as to the admissibility of those exhibits or as to the instructions given to the jury on that point.

Following our indications in *People* v. *Fournier*, *supra* at 273–76, as to the instructions he should give the jury on the issue of voluntariness, the trial judge in tendering his instructions set up the following standards:

"The court instructs you that the contents of Exhibit 42 and 43 of The People which consist of admissions and confessions made by the defendant in the office of the district attorney through the night of October 9 until daybreak on October 10, 1950, are void, because said confessions and admissions were involuntary, because they were obtained from the defendant while he was illegally detained, held incommunicado for three days, without legal assistance and after having been submitted to an interrogation for several hours during the night of that same day, all of which factors produced on the defendant the effects of psychological coercion as a matter of law.

"In other words, you may not analyze those confessions which are admitted by the court for the purpose of determining the veracity of their contents. You should and must take them into consideration for the sole purpose of determining the issue of the voluntariness of the oral confession made by the defendant at San Antón.

"On this point I must say that the confessions contained in Exhibits 42 and 43 must be taken into consideration solely

to determine whether the psychological coercion which induced defendant to make those two confessions had carried over and affected the defendant to the extent of extracting from him the oral confession at San Antón.

"In other words, to determine the issue of voluntariness or lack of voluntariness of the oral confession at San Antón.

"The court instructs you that in order to determine the guilt or innocence of the defendant you should not take into consideration the veracity or falsity of the contents of Exhibits 42 and 43 of this trial which are equivalent to Exhibits 48 and A of the first trial.

"Gentlemen of the jury, a presumption or inference arises that the oral confession given by the defendant at San Antón was obtained by means of psychological coercion and it is the duty and obligation of the district attorney to destroy that presumption or inference.

"The presumption that it was involuntary and that it was obtained by means of coercion was carried over to the defendant at San Antón and it is the duty of the district attorney to destroy that presumption.

"This presumption of coercion which carried over to the defendant while he confessed at San Antón can only be destroyed or defeated if the gentlemen of the jury consider that the evidence offered by The People shows, beyond a reasonable doubt, that the coercive influences had ceased to exist before defendant gave his oral confession at San Antón.

"Gentlemen of the jury, if you have a reasonable doubt of whether or not the district attorney has destroyed said presumption of coercion while the defendant made his confession at San Antón, it is your duty and obligation to give the defendant the benefit of the doubt and to definitively reject said confession of San Antón in deciding this case.

"In order that you may determine whether the coercive influences carried over from the office of the district attorney, where the declarations contained in Exhibits 42 and 43 were given, to San Antón, you must take into consideration four (4) factors, to wit:

"First: Defendant's background as explained by the witness and summarized by the judge;

"Second: You must take into consideration the fact that the defendant was illegally detained for three days without

an opportunity to confer with his attorneys, relatives, or friends;

"Third: You must take into consideration the questioning to which defendant was submitted, as it appears from Exhibits 42 and 43;

"Fourth: And you must take into consideration the nature of Exhibit 43, read together with the other exhibit.

"That is, you must take into consideration both exhibits and the nature and contents thereof, in order to determine the issue of voluntariness or involuntariness of the confession made by the defendant at San Antón.

"Defendant's background not only appears from the exhibit I have mentioned, but it also appears from the testimony of Dr. Troyano de los Ríos on the investigation he made when he went to classify Fournier as inmate in the penitentiary.

"The court informs you, gentlemen of the jury, that according to the evidence presented, defendant's detention in the office of the district attorney as well as at San Antón where he made his oral confession was illegal.

"You should take into consideration all the facts and circumstances, as they appear from the exhibits and the testimony given here by the different witnesses, under which defendant's confessions were produced in the office of the district attorney as well as the facts and circumstances surrounding defendant's confession at San Antón.

"Gentlemen of the jury, if after examining all the facts and circumstances under which the confessions in question were given and which, as I have already told you and as a matter of law, are inadmissible, both No. 42 and No. 43, and which should be considered by you solely to determine the voluntariness of the confession at San Antón, you reach the conclusion that the latter was involuntary, that is, that the district attorney has not affirmatively proved that the confession at San Antón was voluntary, then you shall reject and wholly disregard them in deciding this case, and in that event, you should reject the three (3) of them and not consider any one of the three: neither No. 42, nor 43, nor the one of San Antón.

"If on the contrary you reach the conclusion that the district attorney has proved beyond a reasonable doubt the voluntary character of the confession at San Antón, then you shall take said confession into consideration, since you may use the other two solely to determine the voluntariness of the confession

of San Antón. So that if you reach the conclusion that the confession at San Antón was voluntary, you shall only use that confession and you shall not use the other two which are Exhibits 42 and 43, since they are rejected as a matter of law.

" . . . . . . . .

"The gentlemen of the jury are the judges of the facts, the ones called upon to weigh the evidence and find whether, as the result thereof, the facts alleged by the district attorney or the facts alleged by the defense have been proved.

"The law does not require a specific number of witnesses in order to prove a fact or circumstance. A single witness deserving entire credit may be sufficient to prove a fact or circumstance, except in cases of perjury or treason.

"Nor does the law require such degree of evidence as to produce, excluding every possibility of error, absolute certainty, because such proof is rarely possible. It only requires such moral certainty or such degree of proof as to produce conviction in an unprejudiced mind.

"The effect of the evidence is not arbitrary but you must exercise your discretion judicially and in conformance to the rules of evidence. The jury has no right to dispense with evidence admitted by the court nor to discard arbitrarily the testimony of a witness. And it is your duty to consider carefully the entire evidence presented in the case.

" . . . . . . . .

"It is for you to determine whether or not the conditions continued to exist and in order to so determine you must take into consideration Exhibits 42 and 43 and the circumstances under which those confessions were made and the circumstances under which the confession at San Antón was made.

"If as a result of the evidence and of your own analysis you reach the conclusion that the district attorney did not affirmatively prove beyond a reasonable doubt that the psychological coercion which existed at the time the confessions were made in the office of the district attorney had ceased to exist when the defendant made his confession at San Antón, then you should definitively reject the confession at San Antón.

"Doctor Troyano de los Ríos testified as to the character of the defendant and on that point I elaborated. He further testified that in his opinion the psychological attitude or psycho-

logical pressure of the defendant could have continued in San Antón and become aggravated. This was said by Dr. Troyano de los Ríos.

" . . . . . . . .

"If you decide that the declaration or confession at San Antón was involuntary, that is, that the district attorney did not prove beyond a reasonable doubt that it was voluntary, you must reject the confession at San Antón as well as the other two contained in Exhibits 42 and 43, in order to determine the innocence or guilt of the defendant and you can not consider any one of the three.

"In that event there remains only a case of circumstantial or inference evidence and I shall explain to you what is circumstantial evidence.

"There are two classes of evidence recognized and admitted by the courts of justice, and a defendant may be found guilty on either one. One of them is direct or positive testimony of an eyewitness with respect to the commission of the offense. This is called direct evidence. The other kind of evidence is that proof which by a series of interrelated circumstances points, within a degree of convincing power, to the commission of a crime by the defendant. This is known as circumstantial or presumptive evidence. It may consist of (1) admissions of the defendant; (2) threats made prior to the crime tending to show that there existed animosity against the victim; and (3) a plot for the commission of the crime; as well as any act, declaration, or circumstance admitted in evidence, which tends to connect the defendant with the commission of the crime.

"There is nothing in the nature of circumstantial or inference evidence that makes it less certain than the other class of evidence, that is, the direct evidence. The court charges the jury that to justify conviction on circumstantial evidence alone, it is not only necessary that the circumstances should all concur to show that he committed the crime charged, but they must all be inconsistent with any other rational conclusion. It is not sufficient that the proven facts coincide with, account for, and render probable the hypothesis set up by the prosecution, but they must exclude any other hypothesis than that of guilt. That is, in cases of circumstantial evidence the proven facts must not only be compatible with defendant's guilt but

they must be incompatible with any other rational hypothesis of his innocence; and each independent fact from which guilt is inferred must be proved by means of evidence as satisfactory to the mind and conscience of the jury as is required in a case of direct evidence." [7]

Since the jury rendered a general verdict of guilty, for the crime of first-degree murder with which defendant was charged, it is impossible to determine with any certainty whether it considered the oral confession at San Antón as voluntary, and therefore, weighed it together with the rest of the evidence. However, irrespective of the preliminary conclusion of the trial judge and of the verdict of the jury, we must determine if *in fact* defendant's oral confession in this case was obtained by means of coercion, in violation of the due process of law. This is the applicable test under the due process of law clause of the Constitution of the Commonwealth of Puerto Rico. See *People* v. *Fournier*, *supra*. Furthermore, it is the rule established by the Supreme Court of the United States under the due process of law clause of the Fourteenth Amendment. See *Malinski* v. *New York*, 324 U.S. 401, 404 (1945); *Haley* v. *Ohio*, 332 U.S. 596, 599 (1948); *Payne* v. *Arkansas*, 26 U.S.L.W. 4281 (1958); *Thomas* v. *Arizona*, 26 U.S.L.W. 4312, 4313 (1958). In this respect our inquiry into the issue of coercion is limited to the admitted or undisputed facts appearing from the record. Our function is not to weigh the evidence de novo to determine the basic facts as to the circumstances under which the confession was produced. As a general rule, we can not disturb on appeal the findings of fact (express or implied) based on substantial evidence if there is a dispute as to the circumstances which induced the confession, the voluntariness of which is challenged. But our duty is to make our own findings on the issue of coercion *on the basis of the admitted facts or on undisputed evidence as to the circumstances concerning the voluntariness of the*

---

[7] See Tr. Ev., 6th piece, pp. 76–82, 83, 108–09, 110–12.

*confession. Payne* v. *Arkansas, supra; Thomas* v. *Arizona, supra,* and the cases therein cited; *People* v. *Fournier, supra,* 244–47, 265–71. *Cf.* Maguire, *Involuntary Confessions,* 31 Tulane L. Rev. 125, 132 (1956). In this case an inference or presumption arises to the effect that the coercive influences which induced the first written confession also induced the second oral confession at San Antón. But it is obvious that the scope of this inference can not be weighed abstractly. We must bear in mind the specific type of coercion used to obtain defendant's first confession. And only an anlysis of all the concrete circumstances surrounding the San Antón confession can show whether the coercive influences which produced the prior confession had already dissipated at the time when defendant made his oral confession at San Antón. See *Lyons* v. *Oklahoma,* 322 U.S. 596 (1944); *United States* v. *Bayer,* 331 U.S. 532 (1947); *Stroble* v. *California,* 343 U.S. 181 (1952); *Leyra* v. *Denno,* 347 U.S. 556 (1954); *Commonwealth* v. *Makarewicz,* 132 N.E. 2d 294 (Mass. 1956); *Jackson* v. *State,* 121 A.2d 242 (Md. 1956); *State* v. *Whiteman,* 67 N.W.2d 599 (N.D. 1954). For that reason the touchstone is always the "... *weighing of the circumstances of pressure against the power of resistance of the person confessing."* *Stein* v. *New York,* 346 U.S. 156, 185 (1953); *Fikes* v. *Alabama,* 352 U.S. 191, 197 (1957); *Thomas* v. *Arizona,* 26 U.S.L.W. 4312, 4313 (1958). The crux of the question, therefore, is to determine whether the admitted or undisputed facts are irreconcilable with the mental freedom of the defendant to confess voluntarily at San Antón his alleged participation in the crime. For this purpose, we shall proceed to analyze all the circumstances surrounding the oral confession at San Antón as they appear in the record. First, we must briefly outline here the proof and the testimony introduced in evidence on this matter.

(1) The testimony of *Mr. Luis de Casenave,* a photographer of the newspaper El Mundo, who stated the following: On October 10, 1950, at about 11 o'clock a.m., he went

to the house situated at San Antón, Carolina; it was a partially constructed house; it had no doors or windows and the floor was unfinished; at that time the defendant, the district attorney, several newspapermen, several press photographers, and several detectives were present. He identified several photographs of the house and two other photographs which he himself took while the defendant pointed to a door plank placed across the bathtub within the house. He saw when the defendant, prior to having his picture taken, placed the door plank across the bathtub and heard him say at that point that he had placed the body of Iris Nereida over that plank. While saying these words, the defendant *"was passive, tranquil, he was not upset"* and physically he was in the same conditions as at the time of the second trial. The defendant used his hands and posed freely for the photographers. The newspapermen who were present there asked the defendant questions and the latter behaved "courteously" towards them. He identified another photograph taken by him personally which shows the defendant pointing to the opening of the window towards the northern part of the house. Fournier said that he had carried the body of Iris Nereida through there. While that picture was taken *"every time a question was asked* (the defendant) *answered calmly, without getting upset."* He identified another photograph which he took of the defendant where he is pointing to the floor of the house. Fournier made this gesture when someone asked him where the missing shoe had fallen. At that time the defendant was acting freely. In the presence of Casenave the defendant was not browbeaten, *"nor was he mistreated in any way in the house"* and Casenave remained there until all of them boarded the automobile to return to San Juan. He identified another photograph which he personally took where the defendant appears with other persons looking for a button at the entrance of the house. The last photograph that Casenave took there shows the defendant and the district attorney sur-

rounded by newspapermen and detectives outside the house. At that instant the district attorney told the newspapermen *"the defendant has already confessed,"* then the newspapermen *"made a ring around him"* and the defendant remained there with the group. At San Antón there was no relative or counsel of the defendant. The newspapermen and sometimes the district attorney put questions to the defendant, while the different pictures were taken, but the district attorney never suggested to the defendant what he should answer.

(2) Twelve photographs taken at San Antón and mentioned in the testimony of Casenave as well as of the other subsequent witnesses, introduced in evidence as Exhibit 37 of The People. They show at plain sight that the physical condition of the defendant while making his confession at San Antón was normal. He shows no sign of sleep, weariness, or anger. Besides, it is clear that he was acting and posing freely and unconcernedly. His face does not show any anxiety or regret. He appears to be calm in all of them. He does not look away, but on the contrary, he turns and faces the camera directly in most of them. Even through the sunglasses he wears defendant's eyes look attentive and alert. He has a growing beard but he is well-groomed. His clothes are clean and pressed (black shoes, dark pants, open-neck sport skirt, and light coat). The defendant is calm, making gestures or motions and surrounded by several reporters who were present; Ramírez Brau, Medina Deliz, Sánchez Ortiz, etc.

(3) The testimony of *Mr. Enrique Ramírez Brau,* newspaperman, who testified as follows: He knew the defendant who was *"the son of a friend of mine whom I loved very much,"* and went to the house at San Antón on October 10, 1950. *"It was a partly constructed house",* having no windows, doors, or floor. He arrived there at about 11:30 a.m. and saw the defendant together with the district attorney, several detectives, several newspapermen, and several press

photographers. He identified the photographs of the house which form part of Exhibit 37 of The People, to which witness Casenave referred. Referring to the photographs where the defendant is shown pointing to a door plank across the bathtub, he explained that it was defendant himself who placed the plank there stating at the same time that he had placed Iris Nereida over that plank, had strangled her with the belt she wore around her waist, had moved the body from the bathroom through the living room or dining room of the house, had lifted it through a window, carried it to his automobile and placed it inside the trunk of his automobile. The defendant said that if the district attorney had not ascertained the facts of the case he would have revealed them by December. At all times the defendant explained those facts *"quietly, as if he were an actor . . . his statements as to the manner in which he had killed his victim was* (sic) *made by him in a tranquil, quiet and calm attitude."* No one pressed, coerced, or intimidated the defendant in any way while he explained the manner in which he had killed Iris Nereida. The defendant spoke to the different newspapermen and officers present there, he always behaved *"very friendly";* and *"he was not prevented or stopped in any way to move about or speak . . . and he spoke with serenity."* Referring to two of the photographs of Exhibit 37 of The People, he explained that one of them shows the defendant *"while he explained the manner in which he took out the body . . . "* (through the opening of a window) and that *"on that occasion he was tranquil and calm and made the statements spontaneously";* and in the other one the defendant is shown *"in the bathroom in the San Antón house, pointing with his finger because he is looking for a button which he said came off the dress of Iris Nereida and at that instance he is pointing towards the place where he believes it might have fallen."* In the last photograph taken outside the house he (Ramírez Brau) appears together with the defendant, the district attorney, and a group of newspaper-

men and detectives, while taking down the exact words of the defendant when he said *"that he would have revealed the facts if the district attorney had not ascertained them before December."* The persons present at San Antón were five or six reporters, three press photographers, five or six detectives, a woman detective, the district attorney, the stenographer of the district attorney, and a police photographer; there was no relative or counsel of the defendant. He did not remember if the district attorney made any warning to the defendant as to his right not to testify. The defendant there said that in order to strangle Iris Nereida he used a nail which he found on the floor of the house, but never mentioned that while he strangled Iris Nereida he was angry or in frenzy. On cross-examination he testified that he saw the defendant at daybreak on October 7–8 at the police station in San Francisco Street in San Juan; that he sat on the edge of the bed together with the defendant; that the bed had a mattress, clean sheets and pillows; that he spoke to the defendant and asked him for a picture of Iris Nereida to publish it and that the defendant then answered him: *"look for the 1945 yearbook of the Central High School of Santurce, P. R., which contains a beautiful picture of her";* that on that occasion he told Fournier that the district attorney was going next day to the cemetery because he had information that the body of Iris Nereida was buried there and that he would have to dig up the graves; that then the defendant angrily told him *"tell the district attorney that I have there about 1,800 graves and that he has to pay me $10 for each grave he digs up";* that on that occasion the defendant was angry while at San Antón he was tranquil and peaceful; that the defendant told him then that if the district attorney kept on bothering him he was going to slap him. No one at San Antón asked the defendant why he had taken the life of Iris Nereida. He saw the defendant at the office of the district attorney on October 7 during daytime reading a detective story, but he did not speak to him because

he was not allowed to interview the defendant at that time. He saw a detective in the office of the district attorney together with the defendant. The defendant received *"kind treatment"* from the district attorney and from the detectives at San Antón and likewise *"he was kind to the district attorney and all the persons present there."* The newspapermen *"were friendly* (to the defendant), *in the sense that he behaved very friendly while he reconstructed the scene of the crime."* It was on his own initiative that he went to the cemetery on October 8 to see the body of Iris Nereida in the grave. On October 10, 1950 he was informed at the office of the district attorney that the defendant was going to reconstruct the crime at San Antón and that there was no objection to the presence of the newspapermen.

(4) The testimony of *Mr. Jesús Laureano*, a detective, who stated the following: He saw the defendant and the district attorney in a car on October 10, 1950. They left the office of the district attorney about 10:30 and 11:00 a.m. He (Laureano) did not ride in the same automobile as the district attorney and the defendant, but he went in another automobile behind theirs. On reaching San Antón half an hour later, he saw there many reporters and press photographers. Referring to the two photographs which show the defendant pointing with his right-hand to a door plank placed across the bathtub, he said that at this precise moment Fournier was explaining that on September 7, 1950 he had killed Iris Nereida there. The defendant said specifically: *"I seized her, placed her on that door which I put across the bathtub and then twisted her neck with her own belt. Then after she was dead I lifted her and passed her through the window and left her resting on the window frame, and I jumped out and put her inside the trunk of my automobile."* Defendant's attitude while explaining these facts was as follows: *"He was completely tranquil as if he were explaining any other matter; very calm, he acted altogether freely; walking back and forth and showing us how he had com-*

mitted the crime that he was explaining there. *Each time a photographer wanted to take his picture he posed and allowed the picture to be taken. At no time did he seem nervous; but entirely calm and friendly.*" Referring to another photograph which is also part of Exhibit 37 of The People, he said that it showed detectives and newspapermen together with the defendant while the latter explained how "*he lifted the body through the window.*" In another photograph the defendant "*is explaining where her shoe fell.*" The defendant "*explained that he returned to look for it next day.*" He identified some fibers of the belt of Iris Nereida saying that at San Antón the defendant "*said that they remained in his hand when he twisted it . . . and that he had thrown them in the drainpipe.*" He added that "*then we took out the drainpipe in which he alleged he had thrown the belt fibers . . . and began to take out something that was inside and found this. It was wet and a clod of earth was adhered to the fibers.*" [8] (Exhibit 39 of The People.) He identified five photographs which were taken on October 10, 1950 showing the defendant in the office of the district attorney Mieres Calimano *before* leaving for San Antón (Exhibit 32 of The People.) While the defendant explained in San Antón how he had committed the crime no one pressed him, forced him, or coerced him, and he was "*very tranquil*", "*very cheerful*". On cross-examination he testified (1) that he saw the defendant for the first time on the afternoon of October 8, in the office of the district attorney, (2) that the defendant was then sitting down, doing nothing and that a detective or a secretary of the district attorney was with him; (3) that he again saw him on October 9, at daytime in the office of the district attorney; (4) that he knows that the defendant

---

[8] *By stipulation* there was admitted in evidence a number of nails which constituted Exhibit 38 of The People, which were picked up from the floor of the house at San Antón that same day October 10, 1950 and were similar to the nail which was found in the tourniquet around the neck of Iris Nereida.

slept in the police station the night of October 8–9; (5) that he saw the defendant seated calmly on October 10, 1950 about 9 o'clock in the morning in the office of the district attorney; (6) that he had seen the defendant on the night of October 9–10 in the office of the district attorney, near midnight, but only for a minute because he left shortly thereafter; (7) that on that occasion he saw the district attorney and a detective together with the defendant; (8) that he (Laureano) returned that night to the office of the district attorney and remained there for a while until 3:30 or 4:00 a.m. On the trip to San Antón the defendant went in the same automobile with the district attorney and two detectives. Other detectives followed in another automobile. The trip took about half an hour. Shortly before starting the district attorney told him that they were going to San Antón with Fournier because he *"is going to explain to us how he committed the crime there."* He did not remember whether the district attorney made any warning to the defendant as to his right not to testify. At San Antón there were seven or eight police officers in addition to the district attorney and his stenographer. There were also several reporters and press photographers. He explained, on cross-examination, that at San Antón the defendant said that a button of the dress of Iris Nereida had fallen off and that he had picked it up and thrown it away. The defendant spoke with everybody at San Antón, including the newspapermen, and *"he spoke and walked freely about the place."* No one asked the defendant why he had taken the life of Iris Nereida. On redirect examination he testified that on the evening of October 9–10, defendant's cousin, Henry Hernández, was with Fournier in the office of the district attorney; that on October 8 he went to the cemetery and saw when they lifted the body of Iris Nereida from the grave; that at that moment there were about 20 or 25 persons there, including employees of the cemetery; that the district attorney asked the defendant very few questions at that place.

424

He explained that he went to get Henry Hernández by order of the district attorney Viera Martínez and brought him to the office of the district attorney on that night of October 9–10, 1950.

(5) *Mr. Ernesto Sánchez Ortiz*, newspaperman, who testified as follows: He went to the house at San Antón on October 10, 1950. Referring to the two photographs contained in Exhibit 37 of the People he said: *"These two photographs show the defendant pointing with his right hand to a bathtub with a plank across it and explaining the use which he gave that plank . . . he said that he placed it across the bathtub and there placed the deceased* (Iris Nereida) *and that he had tied a belt and made a tourniquet with a nail and had strangled her."* He stated that the other photograph *"shows the defendant while he is explaining how he lifted the body of Iris Nereida through the window and carried it to the car outside the house and then put it inside the trunk of his automobile,"* and another one shows *"the defendant . . . pointing to the floor where he alleged that he had thrown a button of the dress of Iris Nereida . . ."*. While the defendant described the manner in which he killed Iris Nereida *"he was tranquil and calm."* When the defendant posed for those photographs *"he was in a peaceful and tranquil attitude."* Among other newspapermen present there he mentioned Córdova Chirino, Ramírez Brau, and Medina Deliz, and among the press photographers Mr. Casenave of El Mundo, a photographer of El Imparcial and another one of El Diario de Puerto Rico. On cross-examination he said that he had seen the defendant from a distance on the afternoon of October 7, 1950 in the office of the district attorney and that the newspapermen were not allowed to interview him at that moment. The defendant remained about one hour at San Antón speaking and walking around the house together with the newspapermen and the detectives. On reaching San Antón the defendant was not handcuffed. They immediately went into the house to a small

bathroom and the defendant began to reproduce the scene of the crime. Immediately the defendant began to speak of the facts, acting the way he had killed Iris Nereida. Occasionally the district attorney asked a question, but the defendant and the district attorney or the defendant and the detectives were never alone. At San Antón no one asked the defendant why he had taken the life of Iris Nereida. There the defendant explained the incident of the button and how he had carried the body through the window. Furthermore, the defendant explained that Iris Nereida was wearing the belt; that he took it off, put it around her neck and used it to strangle her; that there remained in his hands some fibers of the belt and that then he threw them down the drainpipe. Fournier said all of this *"voluntarily"* and he never said that he was violent when he strangled Iris Nereida. He did not hear the district attorney make any warning to the defendant as to his right not to testify. The defendant said that the nail he used to make the tourniquet *"was one of the nails lying on the floor, that is, that he picked one of the nails from the floor."* After he had finished reproducing the whole crime, they left the house and the district attorney next to the defendant then said: *"The defendant has already confessed."* The district attorney further stated there that the defendant had expressed his intention of confessing by Christmas if the facts had not been discovered before December. When the district attorney made those statements in the presence of all the newspapermen who surrounded the defendant, the latter *"accepted that he had said that"*, but he could not remember if he assented in words or consented with his silence.

(6) Five photographs of the defendant taken at police station on October 10, 1950, between 8 and 10 a.m., before leaving for San Antón, were presented in evidence as Exhibit 32 of The People. In all of them the defendant is shown with a sport shirt, no tie, dark pants, light jacket and black shoes. He looks tidy and in a normal attitude. His clothes

do not look wrinkled but rather neat and tidy. One of the photographs shows the defendant facing the camera and another one shows his back. There are two other photographs showing his profile, one his left side and the other his right side. The last photograph is a front close-up of defendant's face. It has a serene and tranquil expression. His face shows no sign of weariness, sleep, exhaustion, or anxiety. On the contrary, his look is alert, unconcerned and lucid. It shows that the defendant is in perfect physical condition and he appears to be a sturdy man. His clothes are identical with that shown in the photographs taken at San Antón.

(7) *Mr. Henry Hernández*, who testified as follows: He is defendant's second cousin. He spoke to him in the office of the district attorney on the night of October 9–10 and on that occasion Fournier *"was tranquil"*. He stayed with the defendant that night for about 15 or 20 minutes in the office next to the district attorney's. It was then about 3 o'clock a.m. The defendant made no complaints to him of the treatment he received. He went there because the district attorney sent for him. On cross-examination he testified that at that moment he saw the district attorney and several detectives, but he did not see any relative of the defendant.

The district attorney announced that he had another witness on the issue of the voluntariness of the confession given by the defendant at San Antón, but that he waived his testimony because it was cumulative. Then the defendant's counsel called district attorney Ángel Viera Martínez as his witness with respect to the preliminary issue of the voluntariness or involuntariness of the oral confession at San Antón. This happened after the court had admitted (for the limited purposes already pointed out), without objection from the defense, the interrogation to which Fournier was submitted for six hours on the night of October 9–10 (Exhibit 43 of The People) and the first written confession given by the defendant (Exhibit 42 of The People).

(8) District attorney Ángel Viera Martínez testified as follows: The defendant was detained *"for purposes of investigation as suspect"* on the morning of October 7, 1950. He was kept detained until October 10 following and during that period he was held incommunicado. No relative or attorney was allowed to see the defendant. The latter never asked during that period to see any one of his relatives or an attorney. No attorney tried to see the defendant. Mr. Gaztambide Arrillaga, attorney at law, merely asked how the defendant was, but did not ask permission to see him. During daytime the defendant stayed in the office of the district attorney where *"he remained tranquil . . . in an armchair. He had newspapers at his disposal. He had textbooks . . . he read one of those books. He took . . . a book of detective stories about crimes in France."* The defendant ate, drank, slept, and rested as he wished during the day. He had an electric fan to keep cool, an armchair to rest and take a nap, and *"he was entirely tranquil."* A detective was guarding him. At nighttime he was taken to the police station at San Francisco Street where he slept on a bed with mattress, sheets and pillows. He slept there two nights: October 7–8 and October 8–9.

District attorney Viera Martínez worked continuously interrogating witnesses and investigating facts, on October 7 and 8. All Sunday morning of October 8 he was engaged in digging graves in Fournier Cemetery until he found the body in tomb No. 4. On October 8, at about 1 o'clock p.m. the district attorney took the defendant to Fournier Cemetery to confront him with the body he had found in tomb No. 4. He said that since Fournier was co-owner of the cemetery he wanted the defendant to explain why a body had been found in the cemetery, lying on its face and without a coffin, which appeared to have been clandestinely buried. He explained that the defendant was not nervous when the body was shown to him; that with absolute serenity he looked down at the grave and although the body could not

be identified from its back, he said that it was the body of a woman. When the district attorney asked him: *"what woman?"*, he answered: *"of a woman."* The district attorney added: *"Of a woman clandestinely buried?"*, to which the defendant gave no answer. Those were the only questions that the district attorney put to the defendant at the cemetery on October 8. Immediately Fournier was brought back to the office of the district attorney. No one interrogated the defendant again from October 7 until district attorney Viera Martínez began his interrogation on the night of October 9. Subsequently he had to exhume the body with the aid of Dr. Babbs, the pathologist. It was a very difficult and tedious operation. It was impossible to perform the autopsy on that same day. The district attorney continued to work all day October 9, *"accumulating facts and data"*, until that evening when he began to interrogate defendant after 10 p.m. The questions and answers were taken down by the stenographer.[9] He finished questioning Fournier at about 4 a.m. when the defendant, without having confessed, refused to answer any more of his questions. At that point Fournier did not request to be allowed to sleep. After a short interval the defendant made a written confession which he finished before 6 o'clock in the morning of October 10. District attorney Viera Martínez asked the defendant at that point if he wanted to sleep and the latter said no. The defendant *"was contented and satisfied."* The district attorney told Fournier: *"We must go to the country"*, and the defendant replied, *"When you wish."* The district attorney then insisted: *"Let us leave it for tomorrow"*, but the defendant said: *"No, when you wish."* Before leaving for San Antón the defendant did not lie down, but *"remained in the office sitting down, walking, drank coffee early in the morning* (and) *washed his face."*

[9] They appear in the record as Exhibit 43 of The People to which we have referred. On direct examination defendant's counsel, in order *"to refresh the memory of the district attorney"*, read to him a good part of this interrogatory.

The newspapermen were watching every move of the district attorney and when he was about to board his automobile about 11 o'clock in the morning of October 10 to go to San Antón with the defendant, he met Mr. Ramírez Brau and other reporters. They asked him if they could go and the district attorney answered in the affirmative. He took Fournier to San Antón so that he could explain objectively on the place everything he had done and how he killed Iris Nereida. At San Antón the district attorney merely asked the defendant to explain, right in the place and in front of the bathtub, the way he had committed the crime. There the defendant made his oral confession in the presence of several newspapermen and photographers to whom he explained the manner in which he had committed the crime. The defendant "posed for the pictures at the different stages of the crime committed by him." Returning from San Antón they stopped on the road at Isla Verde and had some coconut water and the defendant drank some. When he arrived at the office of the district attorney Fournier asked to see one of his relatives because he wanted to say that he had confessed. The district attorney suggested several names, among them defendant's mother and his aunt Sara Sampedro. The defendant preferred to see his aunt Sara Sampedro because he did not wish to worry his mother. Then Mrs. Sampedro saw the defendant in the office of the district attorney. On that same day he also spoke to attorney Rubén Gaztambide Arrillaga.

As we have already indicated, on the basis of this evidence the judge declared that the oral confession was not involuntary as a matter of law, and that it was for the jury to determine if the coercive influence which produced the prior confession also contaminated the oral confession at San Antón. The jury was then recalled and the parties presented once more the proof and testimony on the voluntariness of the oral confession.

Luis de Casenave, Enrique Ramírez Brau, Jesús Laureano, and Ernesto Sánchez Ortiz testified before the jury substantially the same as they had testified before the judge. We think it only worth mentioning here that: (1) Ramírez Brau added having returned at 12:30 p.m. from San Antón to San Juan in the same automobile as district attorney, the defendant, and a woman detective. They stopped on the road at Isla Verde and the district attorney offered them all coconuts. At San Antón the defendant *"answered spontaneously"* the questions which the newspapermen asked him while he gave all the explanations and they took all the photographs contained in Exhibit 37 of The People. The defendant behaved there *"with a quiet mind and soft voice."* Among the newspapermen present, there were Sánchez Ortiz, Medina Deliz, Rechani, Córdova Chirino, and Santiago Sosa; and among the photographers, Mr. Casenave. (2) Laureano added that while the defendant was giving all his explanations and made his confession *" . . . he was entirely tranquil and free. He walked through the whole house, followed by all of us, listening to his explanations. When some photographers wished to take pictures he posed for them with entire calmness."* Everybody at San Antón knew that the defendant had confessed, but no one there read any document to the defendant or gave him any document to read; (3) Sánchez Ortiz added that he saw the defendant leading for San Antón in a car at about 11 a.m. on October 10, 1950. The defendant *"went together with the detectives but he was not handcuffed."* When the newspapermen and the photographers reached San Antón, the district attorney assembled them in front of the house and invited them to go inside with the defendant. The defendant entered first and immediately turned left to the room where the bathtub was and there he began to make his confession.[10] Referring to Exhibit 39

[10] On cross-examination the following dialogue took place between defendant's counsel and witness Sánchez Ortiz:

"Q. But before the defendant began to make his confession, did some-

of The People he said that it was a clod of earth with some fibers from the belt of Iris Nereida and that *"the defendant said that he had thrown them into a pipe and that pipe was in the bathroom and at that point we emptied the pipe and found this clod of earth and the fibers of the belt which the defendant alleged had remained in his hands and which he threw down the pipe and . . . were found there."*

---

one ask him to say whatever he wanted? A. We assumed that he went there to make his confession. Q. In the first place, why did you assume that? A. Because we went there for that purpose. Q. Who invited you to go? A. No one invited me, but when I arrived there I saw several photographers and newspapermen in front of the office of the district attorney and when they left we followed them. Q. Did you know where they were going? A. On the way I found out that we were going to Río Piedras. Q. When you joined that caravan of cars, did you know what was going on? A. I did not know, but I knew that it had to do with the investigation. Q. Let us go back. At whose request did the defendant begin to say there what you have said? A. He did it voluntarily. Judge: The question is the following: He began to explain, but at whose request? A. I suppose it was at the request of the district attorney. Ochoteco: The defendant began to speak there as soon as you were all assembled? A. As soon as we went in. Q. Once you went inside the room the defendant began to speak immediately or did someone tell him: 'Say whatever you have to say here'? A. That was it; he spoke at the request of the district attorney. Q. Did the district attorney tell him what he had to say? A. Yes, sir . . . Q. And when the defendant explained what you have just said or while he was speaking or after he had finished explaining what you said, did anyone ask him questions? A. Some reporters asked him some questions. Q. What reporters asked him questions? A. I do not remember; I did not ask him any question. Q. Who else asked him questions there? A. I do not remember. Q. Did the district attorney ask him any questions? A. I did not see him making any questions. Q. At no time? A. At no time. Q. The only action of the district attorney was when the defendant began to testify? What was it that the district attorney told the defendant when he went inside the house and once inside when you said: 'That the district attorney assembled us all'? The question is 'what did the district attorney say to the defendant'? A. I guess that when the district attorney took him there he expected him to say something and after going inside the room he began to speak. Q. My question is, if someone told him: 'Say whatever you have to say'? A. He was expected to describe a scene that had already taken place. Q. Tell me witness, was the defendant asked either by the district attorney or by some detective or reporter if any other person besides him had participated in killing Iris Nereida by strangulation? A. He was not asked. Q. Was he asked there by the district attorney or by some police officer where had the defendant picked Iris Nereida to take her to that place? A. He was not asked. Q. Was

There were also presented in evidence before the jury:
(1) the twelve photographs taken at San Antón while the
defendant was making his oral confession on October 10,
1950, which we have already mentioned (Exhibit 37 of The
People) and (2) the five photographs of the defendant taken
between 8 and 10 a.m. on October 10, 1950, before leaving
for San Antón and which we have already described (Exhibit
32 of The People).

Dr. Rafael Troyano de los Ríos, a psychiatrist, also testi-
fied before the jury as defendant's witness, stating the fol-
lowing: [11] In 1953 he examined the defendant in the peni-
tentiary in order to make a report on the degree of custody
and assignment of work. The defendant showed *"an imma-*

---

the defendant asked whether he had reached that place alone with Iris
Nereida in his car or if he had come with someone else? A. I did not
ask him. Q. Did the district attorney, if you heard him? A. I did not
hear anyone ask him that. Q. Did you hear the defendant say whether
he had come alone or with someone? A. He did not say. Q. Do you
remember whether you heard the district attorney or some detective ask
—or if the defendant said it *motu proprio*—from where did he pick the
nail which served as garrot? A. He said that he had picked the nail
from the floor because in the house there was some wood and nails.
Q. Then the defendant—according to you—said that he had taken the
nail from the floor? A. Yes, sir; because there were other nails there.
Q. I am not asking you that. A. He said yes, that he had picked it
from the floor to make the tourniquet. Q. Did anyone ask the defend-
ant if he brought the nail from his house? A. No one. Q. Did they
ask the defendant how he had taken the belt off Iris Nereida? A. No,
sir. Q. No one asked him anything, either the district attorney or any
detective? A. No, sir, not that I know of. Q. At what distance from
the defendant were you while he was telling the story you have recited?
A. We followed him wherever he went. Q. Were you close or far from
the defendant Fournier? A. I was close. Q. At what distance more or
less? A. Quite close. Q. From your place to where I am? Something
like this? A. Up to here, about four or five feet. I remember there
were many persons around him. Judge: The distance indicated by the
witness is five feet."

[11] As we have pointed out the other two witnesses for the defendant
were: (1) district attorney Viera Martínez, on the preliminary incident
before the judge on the issue of voluntariness of the oral confession, and
(2) Dr. José E. Taveras, a pathologist, whose testimony has no bearing
on the voluntariness of said confession. With the testimony of Dr. Tave-
ras, the defendant attempted to prove that Iris Nereida committed suicide
by strangling herself with the belt and the nail in the form of a tour-
niquet, causing her own death by asphyxia.

*turity in the affective development of the person . . . a super-adaptation to the medium"* which revealed a lack of emotional judgment and which he interpreted *"as a disturbance of the affectivity."* He found a hereditary psychotic trait on the mother's as well as on the father's side. Also, as an only child, brought up in the environment of an undertaker's business, the development of defendant's affective temperament had not been normal. For the defendant *"a dead man is nothing more than a customer . . . for him there do not exist the considerations that there is a sense of affectivity and respect for the dead; for him such a thing does not exist and his attitude is of complete indifference."* The psychological tests to which defendant was submitted showed that he had normal intelligence and an extrovert temperament. The affective and emotional reactions of the defendant had to be the same in the year 1950 as in the year 1953. The psychiatrist said *"I do not know what the mental condition of the defendant was when the first interrogation was finished, nor do I know his mental or psychological condition when he began his confession at San Antón. All I can say is that the psychological condition of the individual six hours later had to be the same or at least very similar to his previous condition. What was his condition? I do not know."* According to the psychiatrist, the defendant is not insane. He can distinguish between right and wrong and he shows no psychic derangement. But defendant *"showed certain abnormalities in his temperament"* (of an emotional character) due to the environment in which he was brought up. The defendant was an only child, from an early age he helped his father in the embalment or handling of corpses and *"this, at the age of 12 or 14 years when the individual has not yet crystallized but is in the process of formation, the affective or temperamental factors degenerate in that atmosphere . . . and that is why I dared to say that Fournier regarded a dead body as if it were a customer . . ."* The occupation of the defendant

(embalmer and funeral director) increased the psychological effects previously described. The psychiatrist declared that sleep is an element tending to repair an exhaustion which blocks the thought and understanding; that certain persons hold up better than others without sleep; and that lack of sleep affects the control, keenness of mind, and the actions of a person. He can not judge defendant's resistance to sleep and he has never submitted him to any test on this particular. He recommended medium custody and clerical work in the penitentiary, because the defendant has academic preparation (high school, two years university in Puerto Rico and several more years in the United States). Prisoners of medium custody can not go out to the campus or walk freely about the building. The defendant showed a *"fantastic serenity"* in his confinement. He adapted himself to the penitentiary in such a way that he felt at home and always observed a conduct of absolute and frank cooperation. He is a narcissistic, selfish, and conceited creature.

That was all the evidence on the issue of voluntariness. Do all of the undisputed facts admitted in evidence show that the second oral confession at San Antón was voluntary or do they show that it was made while the defendant was deprived of his mental freedom to confess or deny his suspected participation in the crime? The determination of that point depends on our appraising the impact of all these circumstances, as outlined herein, on a specific individual: the defendant. We must determine whether the psychological coercion that vitiated the prior confession continued its effects and produced also the later oral confession at San Antón or whether, on the contrary, the initial coercion had already worn off at San Antón. A presumption or inference arises that the coercive influence continued at San Antón. *People* v. *Fournier, supra,* p. 267. As stated by the Supreme Court of the United States: "Of course, after an accused has once let the cat out of the bag by confessing . . . he is never thereafter free of the psychological and practical dis-

advantages of having confessed . . . The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *United States* v. *Bayer*, 331 U.S. 532, 540–41 (1946). That is, as held in *Lyons* v. *Oklahoma*, 322 U.S. 596, 604 (1944), if the effect of the coercion which induced the prior confession had already disappeared before the defendant made his later confession, the latter may be voluntary. This is true especially in cases like the one at bar (1) where the only kind of coercion exercised against the defendant to obtain the first confession was of a psychological nature (*i. e.*, the undue pressure of the illegal detention and of being held incommunicado for three days combined with an unrelenting interrogatory of six hours made by a single district attorney, since the defendant was never submitted to physical violence or personal indignity, and no threats, promises, or offers of any kind were ever made to him); (2) where the defendant is a mature man, intelligent, and well-educated, and (3) where the second confession is made six hours after the earlier one and the defendant is speaking freely to many newspapermen and posing for the press photographers at a place where he can no longer feel any psychological coercion. Cf. *Lyons* v. *Oklahoma, supra; Stroble* v. *California*, 343 U.S. 181 (1952); *Commonwealth* v. *Makarewicz*, 132 N.E. 2d 294 (Mass. 1956); and *Burwell* v. *Teets*, 245 F.2d 154 (C.A. 9, 1957), with *Leyra* v. *Denno*, 347 U.S. 556 (1954); *People* v. *Jones*, 150 P.2d 801 (Cal. 1944); *Jackson* v. *State*, 121 A.2d 242 (Md. 1956); *State* v. *Whiteman*, 67 N.W.2d 599 (N.D. 1954).

In the first place, the factors of undue pressure were already pointed out in *People* v. *Fournier, supra*, 247–62, namely: (1) before being questioned by the district attorney the defendant was illegally detained and held incommu-

nicado for more than three days without being permitted to see his friends, relatives, or attorneys; (2) on the night of the third day of his illegal detention, the defendant was uninterruptedly interrogated by a district attorney for six hours, from 10 p.m. until 4 a.m.; (3) two days before this interrogation the district attorney confronted the defendant with the body of the victim; (4) the nature of the interrogatory was so hard, persistent, and aggressive that it culminated in a situation in which the defendant was deprived of his mental freedom to confess or deny the facts. The controlling factor of the coercion was precisely the nature of this interrogation (see *People* v. *Fournier*, *supra*, 233–38, 258–59). In short, we may repeat here our conclusion in reviewing the first judgment rendered against Fournier: " . . . the manner and nature of the questioning . . . coming after (*a*) the illegal and incommunicado detention for three days, and (*b*) the uninterrupted questioning, for six hours throughout the night, during which the defendant was told by the district attorney that he was obliged to answer and was not entitled to counsel—produced at daybreak a confession . . . which was psychologically coerced . . . " and for that reason " . . . defendant's will was overborne and his confession (written) . . . did not represent the expression of his free and reasoned choice by him." (*Id.* 260–61.)

Such facts are deplorable in the sound administration of criminal justice in Puerto Rico and for that reason we emphatically condemned them in our previous opinion. But our inquiry here deals with the nature of defendant's second oral confession at San Antón. Therefore, we are not restricted to the coercive elements which invalidated the prior confession. There are a series of other factors surrounding the first confession which we must bear in mind to determine whether the psychological coercion had ceased when the defendant made his oral confession at San Antón.

And likewise, we must consider a set of additional factors which spring from the concrete circumstances in which, according to the review of all the evidence we have just made, the second oral confession at San Antón was made. We proceed now to consider them as follows:

1. In 1950 the defendant was a mature man,[12] intelligent, and well-educated. He had finished high school and attended universities in Puerto Rico and in the United States. He was co-owner and administrator of a successful funeral parlor. He did not suffer any mental derangement, although a psychiatrist classified him as *"emotionally immature"*. We are not dealing here therefore with a person of tender age such as the defendant in *Haley* v. *Ohio*, 332 U.S. 596 (1948), nor of meager intelligence as the defendant in *Fikes* v. *Alabama*, 352 U.S. 191 (1957). He was not illiterate or ignorant as the defendants in *Ashcraft* v. *Tennessee*, 322 U.S. 143 (1944) and *Harris* v. *South Carolina*, 338 U.S. 68 (1949). Fournier was an extrovert and selfish man. He had full knowledge of his legal rights which he asserted when interrogated by the district attorney on the night of October 9–10.[13] *Cf. Stein* v. *New York*, 346 U.S. 156, 185–86 (1953). It seems obvious to us that the defendant, in view of his age, character, experience, intelligence, and education, had sufficient capacity to regain and did

---

[12] In 1950 he was over 23 years of age, according to Exhibit 43 of The People.

[13] We attach here as appendix of this opinion part of this interrogation which appears in the record as Exhibit 43 of The People, which clearly shows that the defendant was always conscious of his legal rights. In denying his participation in the crime the defendant told the district attorney to ascertain the facts by investigation; that he was entitled to refuse to answer direct insinuations and accusations of the district attorney; that he would not answer questions which were direct accusations although he did not believe that the answers would incriminate him; that "I came to answer your questions voluntarily, contrary to the opinion of lawyers . . . and I believe I have the right not to answer any more", saying goodnight to the district attorney; that what the district attorney told him were his own conclusions; and at the end insisted that he would say nothing more because "I have my right not to answer."

regain his mental freedom shortly after he had made the first confession. Actually, the uncontroverted testimony of all the witnesses who were present at San Antón confirm what we have just said. The opinion of the psychiatrist to the effect that the mental and psychological condition of the defendant had to be the same in San Antón as it was six hours before in San Juan, has, in our judgment, little value against the picture presented by all the concrete facts as recited by those who witnessed the incidents at San Antón. The general statement of the psychiatrist was not based on concrete facts bearing on the physical or mental condition of the defendant nor did he take into consideration the contents of the juridical concepts of "psychological coercion" and "mental freedom to confess". Any conflict between the testimony of the psychiatrist and that of the witnesses would have to be settled by our concluding that the defendant acted freely and voluntarily at San Antón.

2. Although the defendant was detained and held incommunicado for three days, he was always permitted to rest, sleep, and take food normally. During the daytime he stayed in the office of the district attorney reading detective stories, completely calm, resting and having at his disposal a fan to keep cool and an armchair to take a nap. At nighttime he was taken to the police station, where he slept in a comfortable bed with mattress, clean sheets and pillows. He was never interrogated during that period until the night of October 9, at 10 p.m. when the district attorney began to question him. The interrogation was conducted by a single district attorney for six hours. This is not a case where the defendant has been relentlessly interrogated for long periods of time by relays of officers and policemen, as happened in *Watts* v. *Indiana*, 338 U.S. 49 (1949) ; *Harris* v. *South Carolina*, 338 U.S. 68 (1949) ; *Turner* v. *Pennsylvania*, 338 U.S. 62 (1949), and *Ashcraft* v. *Tennessee*, 322 U.S. 143 (1944). There was an interval after the inter-

rogation was finished. Then the defendant gave his written confession which was finished before 6 o'clock in the morning of October 10. It should be noted that the length of the interrogation was much shorter than in the cases of *Stein* v. *New York*, 346 U.S. 156, 166–69 (1953); *Gallegos* v. *Nebraska*, 342 U.S. 55, 57–59 (1951), and *Lisenba* v. *California*, 314 U.S. 219, 229–32 (1941). Notwithstanding the nature and form of the interrogation which terminated at 4 o'clock in the morning, Fournier already felt *"contented and satisfied"* at 6 a.m. When the district attorney asked him at that point if he wanted to sleep, Fournier answered in the negative. This is nothing strange for a man as physically strong as the defendant.[14] It is significant because it shows that the defendant was neither sleepy nor exhausted. Before going to San Antón, although he had not slept, the defendant had been resting, took some coffee and washed his face. And his excellent condition is eloquently illustrated by the five photographs which were taken between 8 and 10 a.m. on October 10, 1950, fully described earlier in this opinion. They show that two or three hours before going to San Antón Fournier had already regained control of his faculties. His face and his look are not those of a man whose will is broken. We are likewise led to conclude that the lack of sleep played no role in the later oral confession at San Antón nor the tenseness to which he was submitted the previous night. This is also revealed by defendant's photographs taken at San Antón while he made his oral confession and by the testimony of the witnesses who were present at San Antón. We have already described those photographs and statements.

---

[14] In addition to the photographs taken of the defendant at San Juan and at San Antón on October 10, 1950, which reveal by themselves the physical strength of Fournier, we must also point out the following: the defendant weighed in 1950 about 170 pounds and he easily carried on his shoulder the district attorney (who weighed 175 pounds) during the interrogation on the night of October 9–10, 1950. See Tr. Ev., Exhibit 43 of The People, 7th piece, pp. 137–38.

3. The fact that the defendant was confronted with the body of Iris Nereida on October 8 at Fournier Cemetery did not constitute such a gruesome experience for him as the evidence in the first trial seemed to show. In this respect it suffices to recollect the undisputed testimony of reporter Ramírez Brau and district attorney Viera Martínez regarding this incident. In any event whatever impression was left in defendant's mind by this confrontation had lost all its effects two days later when he made his oral confession at San Antón. *Cf. Thomas* v. *Arizona*, 26 U.S.L.W. 4312, 4314, 4315 (1958). In *Lyons* v. *Oklahoma*, 322 U.S. 596 (1944), the first confession of the defendant was obtained after he had been in jail 11 days; had been questioned intensely during the night for more than six hours and was shown a pan with the victim's bones which was placed on his lap. Subsequently he was taken to the scene of the crime where he was interrogated next morning. Twelve hours later the warden obtained a second written confession from the defendant. The Supreme Court of the United States refused to set aside the sentence for life imprisonment after a jury found him guilty at a trial where his second confession was introduced in evidence, in spite of its holding that the first confession was obtained by psychological coercion. It was said that the coercive influence which produced the first confession had disappeared at the time the defendant made his second written confession. See also *Commonwealth* v. *Makarewicz*, 132 N.E.2d 294 (Mass. 1956). What we have just indicated here is equally applicable to any effect that might have been produced on the second oral confession at San Antón by the conduct of the district attorney in showing the defendant a photograph of the body of Iris Nereida during the interrogation on the night of October 9–10. Both incidents might have contributed to making the first written confession involuntary. But, in our opinion, they did not influence the voluntari-

ness of the later oral confession. Furthermore, we must not forget that there was evidence in the second trial on the absolute insensibility of Fournier towards a dead body, for even the psychiatrist said that *"for Fournier a dead body was like a customer."*

4. No threats, promises, or offers were ever made to the defendant to make him confess, either directly to him or in connection with any relative or friend of his. The defendant was never submitted to any personal indignity or physical violence. This is true of the circumstances preceding the earlier as well as the later confession. We are not dealing here with a defendant who confesses after he is compelled to undress and remain naked before the police for many hours as happened in *Malinski* v. *New York*, 324 U.S. 401 (1945); or with a defendant who confesses after receiving blows or other physical violence as in *Brown* v. *Mississippi*, 297 U.S. 278 (1936); *People* v. *Jones*, 150 P.2d 801 (Cal. 1944); *Jackson* v. *State*, 121 A.2d 242 (Md. 1956) and *People* v. *Thomlison*, 81 N.E.2d 434 (1948); or with a defendant who confesses under threats, promises, or offers as in *Harris* v. *South Carolina*, 338 U.S. 68 (1949) (where they threatened to arrest defendant's mother besides being questioned in relays, etc.); *Williams* v. *State*, 212 S.W.2d 383 (Tenn. 1948) and *State* v. *Whiteman*, 67 N.W.2d 599 (N.D. 1954). There was no pressure or threats of crowds of people or even of a single private citizen to make the defendant confess. *Cf. Payne* v. *Arkansas*, 26 U.S.L.W. 4281, 4282 (1958) and *State* v. *Whiteman*, 67 N.W.2d 599 (N.D. 1954). He was not deprived of rest or food at any time. On the contrary, we have already seen the perfect conditions under which he was held during the daytime and nighttime in the office of the district attorney and at police station. Certainly, Fournier was not treated here as were the defendants in the cases of *Watts* v. *Indiana*, 338 U.S. 49, 52–54 (1949) and *Payne* v. *Arkansas*, 26 U.S.L.W. 4281,

4282, 4283 (1958). All these facts are of special importance in appraising the character of the second confession. It is obvious that the *kind* and the *degree* of coercion which produced the first written confession constitute essential factors to determine whether the coercive influence continued in San Antón or whether the defendant had already recovered his mental freedom at San Antón. For this reason we find it necessary to emphasize here that the *kind* of coercion which vitiated the first written confession was solely and exclusively psychological and that there was no evidence of threats, promises, or offers, or of fear or any kind of physical violence or even of difficulties which might be worked on him or other persons. Let us consider now the *degree* of psychological coercion which produced the first written confession six hours before the later oral confession at San Antón. The illegal detention and incommunicado for three days and the nature and form of the questioning for six hours at nighttime were the factors that in combination went below the *Plimsoll line* of due process of law as to the first written confession. *Fikes* v. *Alabama*, 352 U.S. 191, 199 (1957). See *Field*, Frankfurter, J., Concurring, 71 Harv.L.Rev. 77–81 (1957). But in our opinion they did not go much beyond, that is, the excess of pressure which constituted psychological coercion before 6 a.m. on October 10 was relatively light for a man having the age, character, experience, intelligence, and education of the defendant. The effect produced by the prolonged detention and being held incommunicado for three days was weakened by the excellent treatment which the defendant received while he was under the exclusive control of the district attorney and the police. It should be noted that a reporter and a second-cousin of the defendant were able to see him and speak to him during that period. Furthermore, the defendant never asked to see a relative or an attorney while he was detained and no relative or attorney asked to see him during that time. The nature and form of the interrogation exceeded the bounds of

what is just and reasonable under the concept of "voluntariness" as applied to confessions under due process of law. In our former opinion we forcefully condemned the conduct of the district attorney. But in considering the voluntary character not of the first but of the second oral confession made by Fournier six hours later at San Antón, we should not forget that " . . . the interrogation is not inherently coercive, as is physical violence." *Stein* v. *New York*, 346 U.S. 156, 184 (1953). Furthermore, the defendant was interrogated by a single person, district attorney Viera Martínez, who was tired because he had been working intensely during the three preceding days. This is not therefore the case of *Leyra* v. *Denno*, 347 U.S. 566 (1954), where the first confession given by the defendant was wrung from him by an almost trance-like submission to the arts of a highly skilled psychiatrist. Leyra was virtually hypnotized by the psychiatrist and induced by the latter to make a confession on promises of leniency. Shortly thereafter he made a series of confessions in rapid succession: one to the captain of the police, another to his business partner, and another to the district attorney. There was only a five-hour interval between the initial interrogation by the psychiatrist and the last of Leyra's three confessions. The Supreme Court held in that case that all the confessions were "parts of one continuous process" and that they were all involuntary. Of course, the situation in the instant case is entirely different. We reached identical conclusion in considering the character of the second oral confession at San Antón in the first appeal of this case. *People* v. *Fournier, supra*, at 265–71.

5. Six hours after the first involuntary confession the defendant made the oral confession at San Antón. We have already seen that during that period the defendant did not sleep because he did not wish to. However, he rested, drank coffee and washed his face. During the trip to San Antón which lasted half an hour, the defendant was not handcuffed. Upon reaching the place the defendant was not alone with

the district attorney and the police. He was at all times surrounded by several newspapermen and press photographers while he made his oral confession, describing in detail, in words and actions, what happened from the time he strangled Iris Nereida on top of the bathtub with a belt and a nail which he picked from the floor of the house, until he put the body inside the trunk of his automobile. The testimony of the eyewitnesses reproduce vividly the atmosphere and the psychological tone of that reunion at San Antón, where the defendant confessed orally for the second time. The defendant spoke in a quiet and soft voice. He was treated kindly and courteously by the district attorney, the detectives, the reporters, and the photographers. His attitude was likewise friendly and kind towards them. He walked freely back and forth about the house answering spontaneously the questions that the reporters asked him and posing voluntarily each time that the photographers wished to take his picture at the different stages of his confession. No one there pressed him to confess. No one molested, forced, or coerced him. He spoke freely with the newspapermen, with the photographers, and with the district attorney. He was calm, contented, tranquil, and friendly. He did not seem to be nervous at any time and the pictures taken show no sign of weariness, anxiety, or regret. The photographs were taken while he described without any concern all the incidents of the crime. He does not evade the camera, but rather turns and faces it squarely in many of them. Even through the sunglasses he was wearing defendant's look appears to be alert and lucid. At the end of his oral confession at 12 noon he returned from San Antón to San Juan in an automobile with the district attorney and the reporter Ramírez Brau. On the way back they stopped at Isla Verde to drink some coconut water and the defendant had some. Upon reaching the office of the district attorney at San Juan the defendant asked to see one of his relatives because he wished to tell them that he had confessed. He

chose to see his aunt Sara Sampedro so as not to worry his mother and he spoke to her. He also had a conference with his attorney Mr. Gaztambide Arrillaga. Although the defendant was constantly in the custody of the authorities between the first and the second confession at San Antón, the atmosphere was entirely different from that in the office of the district attorney before 6 a.m. on October 10, when he confessed under psychological coercion. Six hours had elapsed. He was not alone with the district attorney but in the presence of six reporters and three press photographers. He had absolute freedom of action and he spoke freely and spontaneously with them. At that place the atmosphere was not hostile against him. The psychological situation as a whole was much more favorable to Fournier than the circumstances which surrounded the defendant in *Lyons* v. *Oklahoma*, 322 U.S. 596 (1944), when the defendant made his second confession. However, in the *Lyons* case the Supreme Court of the United States held that the second confession was voluntary, notwithstanding the fact that the defendant had made an earlier confession under psychological coercion.

For the foregoing reasons we are convinced that the oral confession given by Fournier at San Antón was voluntary. The confession was made when the defendant had regained his mental freedom to confess or deny his participation in the crime. Beyond any reasonable doubt the coercive influences which produced the first written confession had already been dissipated. Fournier's confession at San Antón constituted the voluntary confession of a guilty conscience. It was "voluntary" in the only sense which that term can have when it is applied to a confession given by a person under arrest and suspicion when he is confronted with proof of guilt which he can neither deny nor explain. *Cf. Thomas* v. *Arizona*, 26 U.S.L.W. 4312 (1958) and *Stein* v. *New York*, 346 U.S. 156 (1953). See, also, *Commonwealth* v. *Makarewicz*,

132 N.E.2d 294 (Mass. 1956) and *Burwell* v. *Teets*, 245 F.2d 154 (C.A. 9, 1957), certiorari denied in 355 U.S. 896 (1957).

## VI

In the fourteenth and last assignment it is alleged that "the trial court committed error in denying the motion for a new trial and rendering judgment against the defendant (1) because the defendant was deprived of his right to a fair and impartial trial and of the due process of law; (2) because the verdict is not supported by the evidence and is contrary to law." The appellant based his motion for a new trial on the same errors assigned here against the judgment of the lower court. It suffices to say that we have already rejected those errors because they are groundless. See *People* v. *Tilo*, 67 P.R.R. 463, 468 (1947). The verdict is supported by the evidence and it is not contrary to law. In our opinion there is strong circumstantial evidence which allowed the jury to render a verdict of first-degree murder. See *People* v. *Rosario*, 67 P.R.R. 346, 350 (1947); *People* v. *Rivera*, 70 P.R.R. 541, 545 (1949); *Perkins Criminal Law*, 1957, 71–78. Furthermore, the defendant had a fair and impartial trial in conformance with all the requirements of the due process of law. This is amply revealed by the record before us and by our preceding analysis of all the errors assigned.

The judgment appealed from and the refusal to grant a new trial will be affirmed.

---

### APPENDIX

The interrogation to which the defendant was submitted by the district attorney on the night of October 9–10 (Exhibit 43 of The People) lasted six hours. It takes 147 pages of the record (Tr. Ev., 7th piece, pp. 49–196). We copy here part of the questions and answers which appear in the last

third of this interrogation which clearly shows that the defendant was always very conscious of his legal rights. In the first two thirds the district attorney and the defendant had a lengthy dialogue on matters which are entirely immaterial to the facts charged against Fournier.

"Q. You could not ask? A. You do not like the smile on my face and I have been making a complete analysis of the district attorney Ángel Viera Martínez when he acts one way and then when as district attorney he acts another, and I have studied his character and what amazes me is the readiness with which he changes from an implication with malice to an implication of sincerity and explanation. I have been studying him from this point of view. When I smile at district attorney Viera; as a district attorney he is under the impression that I am teasing or making fun of him, and I am not making fun of him. I am studying that impression; many times I become serious and when he says something in that tone, with such emphasis it seems that such nervousness kills him inside . . . Q. Are you nervous now or not? A. No. Q. Then when you tell someone to go to hell, what else do you do to him besides telling him to go to hell, do you attack him? A. No. Q. But besides telling one to go to hell? A. I do not know what I could answer to that; that you could reach the point of irritating me so that I attack you and I would never attack you. Q. I am going to ask you the following: What conclusion would you reach if there appeared in that grave, at the bottom of a grave, where a hole is made beneath a concrete floor on which the body of a woman is found who was not the wife of Gregorio Fargas; who was not the wife of Ernesto Santana, who was not the wife of Agapito Rosa, who was not the wife of Juan Ponce, nor the wife of Pedro Andino, but your wife, strangled and buried there in the Fournier Cemetery, of which you are co-owner, where you give orders, where you take actions, where you have authority? A. That is the point that may be explained completely by investigation. Q. Did you answer that you had strangled her and buried her there? A. That is your deduction. Q. That is your own deduction. A. Not mine. Q. Who do you think did it? A. As I told you before, if I knew I would have told you. Q. Whom do you suspect? A. No. Q. Did you see the body? A. Yes, I saw it, a body in the tomb that you said was hers. You told

me yourself. Q. Did you recognize her clearly? A. Well, if you showed me the body I could tell you . . . Q. Why does the mouth of Iris Nereida appear covered with a handkerchief? A. I can not tell you. Q. And it appears with the belt tied around her neck by you? A. No, sir. Q. You have tied a nail to it. A. Why does it have to be me? Q. Because it can not be anyone but you, because the dead do not fall into graves, or appear with a cord tied around their neck, with a belt, having carried her to the trunk of the car, having asked Juan Ponce for the keys. A. Now you are making direct insinuations. Q. I am accusing you. A. And with all my rights, if I have them, I am not obliged to answer those questions. Q. If you believe that you would be prejudiced you do not have any right to answer? A. I do not prejudice myself but I refuse to answer. Q. Why do you refuse to answer? A. Because it is a direct accusation. Q. Why did you go to Juan Ponce to look for the keys at night? A. I have nothing more. Now all your questions are accusations of me. Q. I am asking you. A. I have nothing more to answer, if you believe you have a basis for an accusation against me . . . Q. Would you incriminate yourself? A. I am not incriminating myself. Q. I ask if you are incriminating yourself? A. I am not incriminating myself. Q. If you are not prejudicing yourself at all you are going to answer me. A. Now I do not want to answer because this is now a direct accusation. Q. You are not going to answer any questions? A. Of any sort. Q. In no manner, not even inviting it with some answer? A. It depends on what you want. Q. About what else can it be? A. I believe that now this is a direct accusation, you only have to accuse me directly. Q. If you are not incriminating yourself in anything. A. That is what you believe but it may be prejudicial to me. Q. You determine that. A. And you. Q. You believe it is prejudicial? A. I do not believe it is prejudicial. Q. Do you have in mind telling the district attorney to go to hell? A. Now you are acting like a district attorney. Q. I ask you why you went to Juan Ponce looking for the key? A. I do not have to answer anything more. Q. Because it incriminates you? A. I am not incriminating myself. Q. Why did you order Gregorio Fargas to dig a hole? A. I do not have to answer. Now I shall remain silent until it is time to say good night. Q. Why until it is time to say good night, because it prejudices you?

A. Because I am not going to speak any more. Q. You have to answer my questions one by one. A. I came to answer your questions voluntarily contrary to opinions of lawyers who have always told me everything and I believe I have a right not to answer any more. Q. Did you go to your cemetery that night of September 7, 1950, answer me. A. From now on I do not have to answer. Q. Does it prejudice you? A. It does not prejudice me at all. Q. It does not incriminate you? A. It does not incriminate me. Q. You have the obligation to answer. A. I am not going to answer anything any more . . . District Attorney: You do not answer because you are guilty of the murder of Iris Nereida Hernández. You do not answer because you strangled Iris Nereida. A. You are the one who is making that conclusion. Q. Did you strangle Iris Nereida Hernández? A. No, sir. Q. Your ex-wife. A. No, sir. Q. And you buried her in the manner you saw her? A. No, sir. Q. . . . believing you were going to commit the perfect crime. A. You have insinuated that the perfect crime does not exist. Q. Do you answer or don't you answer? A. I answer no, that it is not as you say. Q. Why did you order that hole made in tomb No. 4, below the bottom, about 2-½ feet, why? A. Because you said that it was to see if it leaked. Q. You said to Gregorio Fargas that the body of Iris Nereida Hernández was buried there? A. What I say is no . . . Q. You knew there was a body there. Look and see if it was customary to dig a hole in the bottom of the tomb to see if it really leaked or if you are guilty of murder by strangulation of Iris Nereida Hernández whom you buried in a tomb of your own cemetery and kept quiet because you know the place and you know that it does not leak there. I am going to bring you the nail you used and you are going to tell me where you found it. Are you going to tell me? A. I have nothing more to say. Q. You have nothing more to say, why? A. I have said everything. Q. You have said everything? A. I have left it. I have my rights not to answer . . ."

(After four or five more questions the district attorney finished the interrogation because the defendant definitively refused to continue answering.)